No. 83,543

FRANK DOUGAN, *Appellee*, v. ROSSVILLE DRAINAGE DISTRICT, *Appellant*.

(15 P.3d 338)

Opinion filed December 15, 2000.

*Robert W. Coykendall*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Joseph W. Kennedy*, of the same firm, was with him on the briefs for appellant.

*James C. Heathman*, of Heathman Law Office, of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J: Drainage district appeals landowner's jury award for damages resulting from a 1993 flood. Appellant claims (1) the landowner's claim was barred by the passage of time; (2) the evidence was insufficient to support the jury's verdict; (3) the Kansas Tort Claims Act barred landowner's action; (4) the court erred in refusing to weigh evidence and determine if the verdict was contrary to the evidence; and (5) the court erred in not enforcing a settlement agreement.

Frank Dougan's land lies between the Kansas River and Silver Lake in Shawnee County, Kansas. Silver Lake is an oxbow lake formed when the Kansas River changed its course in the last century. Neither Dougan's land nor Silver Lake lie within the Rossville Drainage District (District). The District, formed about 1905 to maintain levees, ditches, and waterways within the District, collects

and diverts water through the Rossville Drainage Ditch (Rossville Drain) into Silver Lake. The District constructed and maintains the waterway that drains lesser creeks located east and north of Rossville, Kansas. See *Dougan v. Rossville Drainage District*, 2 Kan. App. 2d 125, 126, 575 P.2d 1316, *rev. denied* 225 Kan. 843 (1978) (*Dougan II*).

Dougan's land has flooded five times from 1951 to 1993. For the floods occurring since 1973, Dougan has brought three suits against the District to recover damages caused by flooding. The basis for the claims made in this suit and the relationship of Dougan and the District are reported in opinions found at *Dougan v. Rossville Drainage District*, 243 Kan. 315, 757 P.2d 272 (1988) (*Dougan III*); *Dougan II*, 2 Kan. App. 2d 125; and *Dougan v. Shawnee County Comm'rs*, 141 Kan. 554, 43 P.2d 223 (1935) (*Dougan I*). A diagram of the area is found in *Dougan I*, 141 Kan. at 557, and the facts setting forth the location of Dougan's land with respect to the District are discussed in detail in *Dougan II*, 2 Kan. App. 2d at 126-27.

In *Dougan I, II,* and *III*, the Kansas appellate courts have previously determined that the District is "an upper proprietor of land" to Dougan's property and as such may not gather and divert surface water from its natural course of flowage that exceeds the carrying capacity of the natural watercourse in which the surface water is deposited if the diversion of the water causes damages of a serious and significant nature to a lower landowner. 243 Kan. at 319. The alteration of natural water flow may create a nuisance. 243 Kan. at 319.

This case arises from the 1993 flooding of Dougan's property. In July 1993, approximately 18 inches of rain fell in the area served by the Rossville Drain. When the water level in the Kansas River rose higher than the water from the Silver Lake outlet, Dougan closed his floodgate to protect his property from flooding. A breach developed in the levee along the Kansas River upstream from Dougan's property. Dougan's property flooded. The parties' experts disagree as to whether the flooding was from excess rainfall, inflow through the drainage system, water coming beneath the breach in the river levee, or an elevation in the water table.

On April 12, 1995, Dougan filed claims for July 1993 flood damage against the District, alleging negligence, trespass, and nuisance. Dougan contended that his farmland was flooded due to the operation and maintenance of the Rossville Drain. He asserted that the District gathered and diverted surface water from its natural course into the Rossville Drain and that the diverted flow exceeded the capacity of the ditch, causing water to be deposited on Dougan's property. Dougan alleged that the District's construction, maintenance, and use of the Rossville Drain was in violation of common-law restrictions on collection and diversion of flood waters, constituting a nuisance and a trespass. Dougan requested compensatory damages, and damages for loss of crops, his damaged levee system, and the decrease in his property value.

The District answered that Dougan's claims were barred by the statute of limitations; Dougan's damages were caused by his acts or the acts of persons other than the District; Dougan assumed the risk of flooding; and Dougan's land flooded because of a natural phenomenon and not as the result of its misconduct. In addition, the District contended that Dougan's claims are barred by the Tort Claims Act, K.S.A. 75-6101, specifically the Act's discretionary function exception to liability. The District also filed a third-party petition against Tri-County Drainage District No. 1 (Tri-County), alleging that Tri-County was liable to the District for any amount Dougan recovered from the District.

On November 2, 1998, the case was tried to a jury. The jury returned a verdict for Dougan on the theories of intentional nuisance, negligent nuisance, trespass, and violation of the District's duty as an upper riparian owner of land. The jury found that Dougan had not suffered permanent damages to his property. The jury then determined that the District was responsible for 55 percent of the damages caused to Dougan's levee and 82 percent of the damages to Dougan's crops and awarded Dougan $103,125 for levee damage and $27,876 for crop loss, which totaled $131,001. The jury also found that Tri-County was responsible for 18 percent of the damages to Dougan's crops, $6,119, and 0 percent of the damage to the levee.

The District appealed to the Kansas Court of Appeals. The District's motion to transfer to this court pursuant to K.S.A. 20-3018(c) was granted. Tri-County is not a party to this appeal.

## Passage of Time

The interpretation and application of a statute of limitations is a question of law for which the court's review is unlimited. Likewise, the court's review of conclusions of law is unlimited. *Brown v. State*, 261 Kan. 6, 8, 927 P.2d 938 (1996).

The district court noted that the statute of limitations (or repose) applicable was dependent on whether the prior damages to Dougan's property were permanent or temporary. The jury was instructed as to the difference between permanent and temporary damages to land and requested to determine whether, during the 1993 flooding or at a time prior to the 1993 flooding, Dougan had suffered permanent damages to his property. The jury determined that Dougan's property had not previously suffered permanent damage.

The District contends that the history of repeated flooding to Dougan's land, in 1951, 1967, 1973, and 1983—about once every 8 years, mandated that Dougan had suffered permanent damages because the pattern of flooding allowed Dougan to anticipate the frequency and extent of flooding and to calculate permanent damages. The District concludes that, under the circumstances, Dougan was required to assert a claim for permanent damages following the 1982 flood; therefore, the present action for temporary damages is barred by the statute of limitations.

Dougan argues that the District's failure to take corrective measures, despite knowledge of the risk of flooding resulting from the District's diversion of surface water from its natural course, constitutes a wrongful or negligent act. Dougan asserts that the District has wrongly *continued* its use and maintenance of the drainage ditch and has continuously failed to take measures to reduce or eliminate the risk of trespass or nuisance of occasional flooding of his lands.

## Permanent or Temporary Damages

Whether the injury was permanent or temporary is the determinative factor in commencing the statute of limitations in damage

actions from flooding caused by construction. *Isnard v. City of Coffeyville*, 260 Kan. 2, 5, 917 P.2d 882 (1996). Where lands are subject to overflow by reason of the erection and maintenance of a permanent structure, the owner who has not been compensated for the appropriation of his or her lands may, if he or she sees fit, maintain an action to recover all damages occasioned to the lands present and prospective, and such cause of action accrues at the time of the appropriation. K.S.A. 60-513(b); see *Isnard*, 260 Kan. at 5, 10- 11.

Temporary damages limit recovery for injury that is intermittent and occasional and when the cause of the injury is remediable, removable, or abatable. Damages are awarded on the theory that the cause of the injury may and will be terminated. Temporary damages are defined as damages to real estate which are recoverable from time to time as they occur from injury. *Isnard*, 260 Kan. at 7. If the damages are temporary and the injury abatable, the general rule is that a new cause of action accrues with each new injury, at least until the injury becomes permanent. In such a case, the 2-year statute of limitations commences with each new temporary injury. *Gowing v. McCandless*, 219 Kan. 140, 145, 547 P.2d 338 (1976).

Permanent damages are awarded on the theory that the cause of an injury is fixed and that the property will always remain subject to the injury. Permanent damages are damages for the entire injury done—past, present, and prospective—and, generally speaking, those which are practically irremediable. If an injury is permanent in character, all the damages caused thereby, whether past, present, or prospective, must be recovered in a single action. *Isnard*, 260 Kan. at 7. If a plaintiff suffers permanent damages, the cause of action begins to run at the time of the damage; therefore, the plaintiff must bring his or her tort claim within 2 years after the injury is reasonably ascertainable. *Thierer v. Board of County Comm'rs*, 212 Kan. 571, 574, 512 P.2d 343 (1973).

In judging whether damages are temporary or permanent, three factors are analyzed: (1) the nature of the causative structure, (2) the nature of the damages, and (3) the ability to determine or estimate damages. *Isnard*, 260 Kan. at 9.

In *Dougan II*, the Court of Appeals addressed the question of when a cause of action for permanent damages from flooding accrues. The flooding in *Dougan II* resulted from the District's alterations to the network of drainage ditches and waterways between 1942 and 1954. The alterations were made without the knowledge and consent of the State Board of Agriculture, Division of Water Resources' chief engineer. As a result of the alternations, Dougan experienced flooding in 1967 and 1973. After the 1967 flood, Dougan's mother (who owned the land at the time) discussed a possible solution with the District. The District did some dredging work, at its expense. Dougan filed suit in 1974, after the 1973 flooding, seeking a permanent injunction, permanent damages for damage to real estate, and temporary damages for lost crops.

The District contended that Dougan's suit was time barred because Dougan had suffered flood damages in 1967 which should have been considered permanent damages. The district court granted the drainage district's motion for summary judgment, determining that Dougan's permanent damages claim accrued in 1967 and that the action was time barred. The Court of Appeals found that because Dougan's future flood damages were not ascertainable in 1967, Dougan's damages as a result of the flooding in 1967 were temporary. The Court of Appeals reasoned:

"Damages cannot be awarded on mere conjecture or speculation. The plaintiff's land has been flooded twice in the last twenty-four years. Had plaintiff been required to bring his action within two years of the 1967 flooding, his chance of recovery would have been slim. It would have been nearly impossible for plaintiff to have sustained the burden of proof as to permanent damages. Plaintiff's damages were not reasonably capable of judicial ascertainment. Although it was apparent there might be some damage in the future, their nature and extent would have been highly speculative. The flooding of plaintiff's land was contingent upon a number of events occurring at approximately the same time. First, a substantial rain had to occur at a time when Silver Lake did not have sufficient capacity to handle the additional water discharged into it by the drainage district. At the same time, it would be necessary for the Kansas River to be at flood stage. Flood stage on the Kansas River is affected by rains that occur upriver. The Kansas River level is further affected by the water storage capacity available at that time in the numerous reservoirs on the Kansas River tributaries. In 1967, it would have been highly speculative as to whether the necessary combination of events and circum-

stances would again occur in the proper sequence to flood plaintiff's land, and, if so, at what frequency." 2 Kan. App. 2d at 129.

The *Dougan II* court reversed the district court, observing: "The flooding in this case is temporary, occasional, and recurrent. There is no indication or allegation that the flooding caused permanent injury to the land itself in 1967." 2 Kan. App. 2d at 129.

Based on the rationale of *Nida v. American Rock Crusher Co.*, 253 Kan. 230, 855 P.2d 81 (1993), Dougan contends that the act giving rise to the cause of action in this case was the entry of waters onto his property. He argues that the 1993 flood was a new trespass on his land, as each new flood which occurs is a separate tort, distinct in its elements from each earlier flood. The *Nida* court considered the application of the statute of repose in the context of a trespass claim. In *Nida*, underground mining had occurred more than 30 years before the landowners brought suit. The suit was brought within 2 years of when the surface of the plaintiff's land sank approximately 10 feet due to the mines. In addressing the application of the statute of repose, the *Nida* court stated:

"In a trespass action, the intrusion and the interference and the occurrence of damage are concurrent. The act committed by the defendant may have taken place much earlier, but there was no trespass until the surface was affected.

"The theory of a negligence action differs in that the wrongful act is the act of the defendant. Once it takes place the negligence has occurred, even though the harmful consequences may not be manifest until later.

"Although a negligence cause of action usually runs from an act of a defendant, a trespass action need not, and often would not, run from an act of defendant. There is no trespass until the entry is accomplished and the damage occurs (or has begun to occur, as in case of continuing trespass). The trespass counterpart of the negligence 'wrongful act' is the entry and the damage." 253 Kan. at 238-39.

Regarding his claim of nuisance, Dougan's argument is similar to his trespass argument. For authority Dougan quotes *Henderson v. Talbott*, 175 Kan. 615, 622, 266 P.2d 273 (1954), where this court stated:

" 'There are cases in which the original act is considered as a continuing act, and daily giving rise to a new cause of action. Where one creates a nuisance, and permits it to remain, so long as it remains it is treated as a continuing wrong, and giving rise, over and over again, to causes of action. But the principle upon which

one is charged as a continuing wrongdoer is, that he has a legal right, and is under a legal duty, to terminate the cause of the injury.' "

In *Henderson,* a downstream landowner constructed a dam in a natural watercourse which caused an overflow onto the plaintiff's land. The defendant asserted that the statute of limitations barred the plaintiff's action. The *Henderson* court noted:

"The question when a cause of action for damages because of overflow of land accrues is one beset with difficulties, on which the authorities are in great conflict and exhibit considerable confusion. This is true even in our own jurisdiction where it must be admitted there is some contrariety in our decisions.

"Be that as it may we are convinced the rules, established by the great weight of authority and recognized and applied by our better reasoned decisions, governing and decisive of such question as well as the question whether the flooding of land gives rise to a single right or successive rights of action are those succinctly set forth and stated in 56 Am. Jur., Waters, 529 § 45:

'. . . In actions by riparian owners for damages for interference with the flow of a stream, the scope of recovery is usually held to depend on whether the injury is permanent or continuing. The weight of authority is to the effect that whenever the structure or obstruction impeding the flow of water is of a permanent character, and its construction and continuance are necessarily an injury, the damage is considered original, to be recovered in one action, and not continuous in character, and the statute of limitations begins to run from the completion of the obstruction, or at least from the time of the first injury. But when the construction and continuance of the structure are not necessarily injurious, but may or may not be so, the injury to be compensated in a suit is only the damage which has happened; and there may be as many successive recoveries as there are successive injuries. In such cases the statute of limitations begins to run from the happening of the injury complained of.'

And in 56 Am. Jur., Waters, 858, 859, § 443:

'The determination of the question whether the flooding of land gives rise to a single right or successive rights of action depends ordinarily upon whether the injury or the causative condition is permanent or temporary. The rule prevailing in most jurisdictions is that if the injury is permanent, or if the causative structure or condition is of such a character that injury will inevitably result and the amount of the damage can be determined or estimated, a single action may and should be brought for the entire damages, both past and prospective. But if the overflow is merely temporary, occasional, or recurrent, causing no permanent injury to the land, or if the situation involves other elements of uncertainty, such as the possibility or likelihood of the alteration or abatement of the causative conditions, or uncertainty in regard to the future use or improvement of the land, so as to prevent a reasonably accurate estimate of future damages, it is generally held that each

[repetition] of the overflow gives rise to a new cause of action for which successive actions may be brought.' " 175 Kan. at 620-21.

The District now asserts that Dougan's 1982 flood damages are permanent damages because the pattern of flooding is well established and Dougan was capable of ascertaining the permanent damage to his property at that time.

Applying the *Isnard* test regarding whether damages are temporary or permanent, the nature of the causative structure, the nature of the damages, and the ability to determine or estimate damages are the relevant considerations in determining the nature of damages. See *Isnard*, 260 Kan. at 9. It is true that Dougan was in a better position to estimate his damages in 1982 than he was in 1967 and the nature of the structure, the Rossville Drain, may be a permanent structure. The jury found that Dougan's land was not permanently damaged. The flooding of Dougan's property was temporary, occasional, and recurrent. Dougan's damages were temporary and were not barred by the passage of time. Therefore, a new cause of action accrued. Dougan filed his action within 2 years of the last injury.

## Applicable Statute of Limitations or Repose

The District argues that regardless of whether this court finds that Dougan's injuries are temporary or permanent, his action is barred by the 15-year statute of limitation of K.S.A. 60- 507, which provides: "No action shall be maintained for the recovery of real property or for the determination of any adverse claim or interest therein, not provided for in this article, after fifteen (15) years from the time the cause of action accrued." Dougan asserts that statute is inapplicable to the facts of the case.

For authority, the District relies on *Johnson v. Board of Pratt County Comm'rs*, 259 Kan. 305, 315, 913 P.2d 119 (1996), where the court noted that rights may be acquired in an artificial condition of water in the same way that they can be acquired in real estate generally. That statement was a response to the plaintiff's contention that she had obtained rights in the flow of water as it existed before the county altered the flow by building a new bridge. Here, the District is apparently asserting that it has acquired the right to

flood Dougan's property because the flooding has existed for more than 15 years. However, the statute is inapplicable to this case because the District has not asserted it obtained a property right in Dougan's land, nor has an inverse condemnation action for taking of land been brought by Dougan against the District.

The statute of limitations applicable to tort actions involving the flooding of land caused by the construction of a public improvement is K.S.A. 60-513(a)(4). See *Isnard*, 260 Kan. at 5. That section provides for a 2-year statute of limitations. As to when the statute begins to run, K.S.A. 60-513(b), a statute of repose, provides:

"[T]he causes of actions listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

A statute of repose limits the time during which a cause of action can arise and usually runs from an act of a defendant. It abolishes the cause of action after the passage of time even though the cause of action may not yet have accrued. *Nida*, 253 Kan. at 236.

The jury determined Dougan's injuries are temporary. Dougan filed his suit within the 2-year statute of limitations. Dougan's suit is not time barred.

### Sufficiency of the Evidence

When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 361-62, 837 P.2d 330 (1992).

To prevail on the theories of liability alleged, Dougan had to prove to the jury that the District, in the construction, operation, maintenance, and control of its drainage district, diverted the nat-

ural flow of drainage into the Rossville Drainage Ditch and into Silver Lake. Further, Dougan had to prove that in doing so, the District exceeded the capacity of Silver Lake, thereby flooding Dougan's croplands and causing damage.

## Proof of Causation

First, the District contends that Dougan did not establish that the Rossville Drain is an artificially constructed waterway or that the District diverted the "natural" flow of drainage through Dougan's land.

Dennis Keller, a member of the Board of the Rossville Drainage District, testified that he believed the Rossville Drain to be a natural watercourse. He stated, however, that over the years, the District has altered parts of the course, but it has done nothing to increase the flow of water that is gathered in the drainage district and diverted to Silver Lake.

Dr. Bruce M. McEnroe, Dougan's expert, testified that the Rossville Drain has characteristics that are not found in natural waterways. Dr. McEnroe is a professional civil engineer and professor at the University of Kansas in the Department of Civil and Environmental Engineering. Dr. McEnroe is an expert qualified with a Ph.D. in engineering, speciality in hydrology. His credentials were not impeached at trial.

McEnroe opined in great detail several reasons why the Rossville Drain is not a natural waterway because it has physical characteristics that do not occur in natural waterways. We have reviewed McEnroe's testimony and find that the evidence is sufficient to sustain the conclusion that the Rossville Drain is an artificial waterway.

The District also contends that the evidence was insufficient to conclude that it was responsible for construction of the Rossville Drain. There was no direct evidence presented at trial that the District constructed the Rossville Drain. Dennis Keller testified that the District has maintained the ditch for many years and that the District constructed parts of the Rossville Drain, in particular, the levee.

A levee is an embankment or artificial mound of earth constructed along the margin of a river to confine the stream to its natural channel or prevent inundation or overflow. Black's Law Dictionary 906 (6th ed. 1990). The evidence that features which do not occur in a natural waterway occur in the Rossville Drain and Keller's admission that the District has constructed certain features in the Rossville Drain, provide sufficient evidence from which the jury could infer that the Rossville Drain is a constructed waterway and the District has constructed certain features to confine and direct the water flow to conform to the drain.

Finally, the District complains that the evidence was insufficient for the jury to find that the Rossville Drain contributed to or caused Dougan's damages. The District asserts that in 1982, water overflowed Cross Creek and flooded down the valley unconstrained by any levees, ditches, or structures and flowed naturally along the course of, but outside, the Rossville Drain into Silver Lake and onto Dougan's land. The District concludes that the events of 1982 demonstrate that because of the natural inclination of water to flow in the general downhill course, the flood waters would have ended up on Dougan's land absent the Rossville Drain.

After the 1982 flood, Dougan sued the District for damages and the District moved for dismissal on the basis of statutory immunity. *Dougan III* came to this court on interlocutory appeal. We determined that under those circumstances, the discretionary function exception under the Tort Claims Act did not provide immunity to the District. Dougan states in his brief that on remand of *Dougan III*, the District argued to the jury that absent the Rossville Drain, Dougan's land would have flooded, and the jury rejected the argument. Neither party cites authority for the outcome of the case on remand of *Dougan III*. An appellant has the duty to designate a record sufficient to establish the claimed error. Without an adequate record, the claim of alleged error fails. *In re B.M.B.*, 264 Kan. 417, 435, 955 P.2d 1302 (1998). The unsupported assertions of both parties are not evidence for this court to consider; therefore, the outcome on remand of *Dougan III* regarding the jury's verdict in that case is not evidence here.

The District also claims that eyewitness testimony supports a finding that the water which flooded Dougan's land came from sources other than the Rossville Drain. The District points to the color of the waters, captured in photographs and testified to by eyewitness accounts, as evidence that the darker waters from the Kansas River breach affected the Dougan farm rather than the Rossville Drain where the waters were clear. The District made this argument at trial, and Dougan disputed it with expert testimony by McEnroe. McEnroe attributed the coloration of the water to a number of factors, including water depth, undergrowth, lighting, and camera angles.

McEnroe testified that he had concluded, based on his own observations and on maps and photographs, that the Kansas River levee breach did not contribute to Dougan's flooding. With aerial photographs of the levee breach, McEnroe showed that the water from the Kansas River levee breach ponded where it overtopped the levee and flowed to points where the land sloped down. McEnroe pointed out low lying areas that would have been more flooded if the river water had reached Dougan's farm.

The District also argued at trial and again on appeal that the increased volume of water at a time when no rain fell is proof that the flooding was the result of the Kansas River levee breach rather than from water flowing from the Rossville Drain. The District presented evidence that the water level rose from July 27, 1993, to July 30, 1993, when the rain had ceased to fall.

McEnroe explained that the increased volume could be attributed to water leaching out of the water-saturated soils. Dougan also asserts that the continued flow of water onto Dougan's land after the rain stopped resulted from water being released by the retention ponds the District constructed to regulate the flow of water from the hills.

Clearly, there was evidence presented at trial from which the jury could have found that the flooding on Dougan's land was not the result of the District's drain. There was also evidence in support of the jury's verdict. Drawing all reasonable inferences from the evidence and considering the evidence in the light most favorable to Dougan, the evidence is sufficient to support the verdict that

the District was the cause of flood waters reaching Dougan's property in July 1993.

## Levee Damage

Dougan's levee was damaged by the flow of water onto his property. Dougan requested damages for the damage to his levee. Dougan presented evidence in support of his claim, and the jury awarded Dougan 55 percent of his prayer for damages. The trial court, in its memorandum and order denying the District's motion for new trial, found that there was evidence sufficient to support the jury's verdict and that the jury verdict was consistent with the testimony of Dougan's expert, Virgil Bisnett. The District contends on appeal that the evidence is insufficient to sustain the jury's award.

Bisnett, a heavy-equipment operator who specializes in dams, roads, and levees, provided an estimate for Dougan regarding repairs on his levee. When Bisnett inspected Dougan's property, the levee was visible but broken. He testified that there were many holes and burrows in the levee and trees growing all over it. Bisnett described the condition of the levee as poor and opined that it had not been properly maintained. He testified that he estimated that it would cost $187,000 to clean out the channel and put the levee back to its original height.

The jury determined that the District caused 55 percent of the damage to Dougan's levee. Therefore, the jury took into consideration the condition of the levee in its damage award.

## Kansas Tort Claims Act

The issue of the applicability of the Kansas Tort Claims Act involves the interpretation of a statute. Interpretation of a statute is a question of law, and the Supreme Court's review is unlimited. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

K.S.A. 75-6103(a) provides:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circum-

stances where the governmental entity, if a private person, would be liable under the laws of this state."

K.S.A. 75-6104(d) provides governmental immunity from liability for discretionary functions. The application of these provisions was analyzed fully in *Dougan III*. In that case, this court determined that the discretionary function exception under K.S.A. 75-6104(d) is not applicable in situations where a legal duty exists, either by case law or by statute, which the governmental agency is required to follow. The governmental agency does not have a discretionary right to violate a legal duty and avoid liability. *Dougan III*, 243 Kan. 315, Syl. ¶ 3. We held that the District cannot legally claim that it has a discretionary right to alter a natural flow of a watercourse so as to cause damage to an adjacent landowner outside the district. 243 Kan. at 324-25. The District's claim of governmental immunity based on a discretionary function failed in *Dougan III*.

The District takes exception to this court's holding in *Dougan III* that a breach of duty means that there can be no discretionary function exception from liability. To support this argument, the District relies on the concurring opinion in *C.J.W. v. State*, 253 Kan. 1, 20, 853 P.2d 4 (1993). The *C.J.W.* court found that the State had a duty to warn of a detained child's propensity for violence and to protect other children in the State's custody from the violent child. The special relationship between the state agency and the injured person gave rise to the duty. The District points to Chief Justice McFarland's concurring opinion, which stated:

"The majority opinion concludes SRS had a legal duty to warn Johnson County Juvenile Hall of Randy's propensity for violent and sexually deviant behavior. It then holds that discretionary function exception does not apply when breach of a legal duty is asserted. This holding would seem to eliminate the discretionary function exception to the Kansas Tort Claims Act (K.S.A. 1992 Supp. 75-6104[e]), as a tort is a breach of a duty owed by one person to another. See *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983). There is no claim of tort under the Tort Claims Act unless an assertion is made that a duty owed has been breached.

"Unlike *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), there is no manual or set of guidelines requiring the SRS caseworker to disclose information in her files to the Johnson County detention facility. The question

then becomes whether to disclose or not disclose is a discretionary act of the caseworker." 253 Kan. at 20.

It should be noted that the majority found that the discretionary function exception to the Kansas Tort Claims Act is not applicable in those situations where a legal duty exists, 253 Kan. 1, Syl. ¶ 7, citing *Dougan III* as authority. 253 Kan. at 14. Therefore, *C.J.W.* found that the discretionary function exception to the Tort Claims Act does not apply where the governmental entity owes a legal duty to the plaintiff.

The District also relies on *Brock v. Richmond-Berea Cemetery Dist.*, 264 Kan. 613, 957 P.2d 505 (1998). The *Brock* court held that a cemetery district was not liable to a child who was injured when a grave marker fell on the child. Three factors were critical to the court's decision in that case: (1) K.S.A. 75-6104(k) provided a specific exception excluding liability for the failure to make an inspection or the making of an inadequate or negligent inspection of any property other than the property of the governmental entity; (2) the cemetery district had no prior knowledge of the dangerous condition of the grave marker; and (3) the cemetery district did not owe a duty to the child or breach any duty owed to her. 264 Kan. at 625. Because the cemetery district did not owe a duty to the child, the case did not abrogate the rule that the discretionary function exception to the Tort Claims Act does not apply where the defendant owes a legal duty to the plaintiff.

*Dougan III* held that the discretionary function exception in K.S.A. 75-6104(d) of the Kansas Tort Claims Act is not applicable in those situations where a legal duty exists, either by case law or by statute, which the governmental agency is required to follow. The governmental agency does not have a discretionary right to violate a legal duty and avoid liability. 243 Kan. 315, Syl. ¶ 3. It noted that an upper proprietor of land owes a duty to a lower landowner to not gather and divert surface water from its natural course of flowage and thereby exceed the carrying capacity of the natural watercourse in which the surface water is deposited if that action causes damage of a serious and significant nature to a lower landowner. 243 Kan. 315, Syl. ¶ 1. Therefore, the discretionary function exception does not apply to the District.

### Failure to Reweigh the Evidence

The granting of a new trial is a matter of trial court discretion and, as with all discretionary matters, will not be disturbed on appeal except by a showing of abuse of that discretion. *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 458, 856 P.2d 906 (1993). Whether the district court applied the correct standard when ruling on the issue is a question of law. An appellate court's standard of review on questions of law is unlimited. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

The memorandum decision and order on the District's motion for new trial states:

"In considering Rossville's motion for new trial, the Court must resolve all facts and inferences in favor of Dougan. If reasonable minds could reach different conclusions, the Court must uphold the verdict. [Citation omitted.] Contrary to arguments of Rossville, this Court cannot weigh the evidence to determine if the verdict is contrary to the conclusion which the court would reach if acting as a sole trier of fact. A new trial may only be granted when the Court finds a ground under K.S.A. 60-259(a)."

The provision of K.S.A. 60-259(a) *Fourth* which applies to this discussion is that the court may grant a new trial if the verdict, report, or decision is in whole or in part contrary to the evidence.

In *Mettee v. Urban Renewal Agency*, 219 Kan. 165, 166, 547 P.2d 356 (1976), the trial court ruled the jury's damage award in a condemnation proceeding was "grossly excessive under the credible evidence." The landowner had expert witnesses testify that the value of the land was $46,785 and $42,000, while the agency's experts stated the value was $9,375 and $10,500. The jury accepted the $42,000 figure as the land's value. The trial court refused to accept the jury's verdict and instead opined that the fair market value of the land was $28,000. The landowner appealed the court's order for a remittitur or new trial.

The *Mettee* court noted that K.S.A. 60-259(a) permits the granting of a new trial where the verdict is in whole or in part contrary to the evidence; it reversed the trial court because the verdict was not contrary to the evidence and was within the evidence offered to establish the value of the land. The *Mettee* court held that there was no ground under K.S.A. 60-259(a) for awarding a new trial

where the jury's award was within the scope of the evidence. Therefore, the trial court lacked jurisdiction to order a new trial. 219 Kan. at 168-70.

In a case involving inadequate, rather than excessive, damages this court, in reviewing the important policy reasons for allowing juries to determine damage awards, noted: "This is not to say however that there is no judicial control over jury verdicts in personal injury cases where the verdict is manifestly excessive or inadequate." *Smith v. Newell*, 210 Kan. 114, 118, 499 P.2d 1112 (1972). The appellate courts have the power to issue a remittitur where a verdict shocks the conscience of the appellate courts. See, *e.g.*, *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, Syl. ¶ 9, 507 P.2d 288 (1973).

Here, the jury's verdict was within the evidence presented at trial and was not such that it shocked the conscience of the court. Therefore, the trial court was correct in concluding that it could not weigh the evidence to determine if the verdict was contrary to the conclusion which the court would reach if acting as a sole trier of fact.

### Failure to Enforce a Settlement Agreement

The legal effect of a written instrument is a question of law for the court to decide. On appeal, a written instrument or contract may be construed and its legal effect determined by the appellate court regardless of the construction made by the trial court. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998).

On December 15, 1997, the district court conducted a hearing to outline the terms of a proposed settlement agreement. Counsel for the District stated:

"[T]he plaintiff and the defendant [have agreed] that we would settle this litigation . . . . [T]he settlement that we've entered into would also include either a flowage or pondage easement of some kind applicable to the land at high water, which would be an easement for water that would run onto the land.

"The District is also agreeing that it would not alter the topography of the drain bases in such a way so as to increase the volume of water moving out of the southerly end of the drain, but the District can maintain the drain to historic design standards and will be allowed to do that.

"Plaintiff would agree to maintain the ditches and levees which are on his property in such a fashion so as not to allow flowing water to be dumped onto adjacent landowners, and the District would pay a total of $50,000 to plaintiff, and/or his wife, as they designate, and that would be characterized for allocation between the easement and the damages in a fashion that would be described by plaintiff's experts, tax experts."

Counsel then stated that the parties "may have to refine that a little bit as we go along." Counsel for Dougan stated, "I believe counsel has described the [breadth] of our agreement, and we would concur with his recitation." When asked by the trial court when a stipulation of dismissal might be filed, counsel for the District stated that the District had to find funding for the settlement and resolve the capital gains implications. He stated, "[T]he timing could be at some point in the future, a month or two, or something. I don't know. It depends on the changes in the capital gains rules, among other things, and the District's ability to finance the settlement."

Following the hearing, Dougan refused to agree to an easement. The District moved the court to enforce the agreement. In a memorandum decision, the district court found that the parties reached an informal agreement. The court based this finding on the credibility of the witnesses and the course of conduct and circumstances. The court found further that it had been clearly expressed during the negotiations that the only way there would be a settlement was if there was an easement or some other mechanism for ensuring that there would not be future litigation. The court found that this term was "clear" and was "not negotiable." The court noted that Dougan clearly understood that settlement had been reached and concluded that Dougan "did authorize the settlement, but then refused to undertake good faith negotiations of the terms of the document which would finalize the agreement."

In concluding that the parties' informal agreement was not an enforceable settlement, the district judge observed that the underlying principles to enforce such an agreement included a meeting of the minds as to all essential terms of the agreement, *Weil & Associates v. Urban Renewal Agency*, 206 Kan. 405, 414, 479 P.2d 875 (1971), and the parties' intent to be bound, *King v. Wenger*,

219 Kan. 668, 671-72, 549 P.2d 986 (1976). The district judge found that Dougan and the District contemplated continued negotiation of essential terms and conditions of the contract but lacked a "meeting of the minds" regarding an essential term of the contract. The court noted that agreements pertaining to an interest in land must be reduced to writing to avoid the statute of frauds.

In order for parties to form a binding contract, there must be a meeting of the minds as to all essential terms thereof. Moreover, with certain exceptions, an agreement to make a contract in the future is not binding unless all the terms and conditions are agreed upon and nothing is left to future negotiation. *Weil*, 206 Kan. at 414. In addition, no interests in lands shall at any time be assigned or granted unless it be by deed or note, in writing, signed by the party or his or her agent assigning or granting the interest. K.S.A. 33-105. No action shall be brought on any contract for the sale of lands or any interest in lands unless the agreement upon which the action is brought is in writing and signed by the party to be charged. K.S.A. 33-106. It is well settled that an easement is within the statute of frauds and must be in writing. *Smyre v. Kiowa County*, 89 Kan. 664, 668, 132 Pac. 209 (1913).

The essential terms of the contract were not sufficiently defined to evidence a meeting of the minds. Furthermore, the interest in lands was an easement, which is enforceable only after it has been reduced to writing.

Affirmed.

ABBOTT, J., not participating.

DAVID S. KNUDSON, J., assigned.