**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 25, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PHILLIP G. CLINE,

        Plaintiff-Appellant,

v.

SOUTHERN STAR CENTRAL GAS
PIPELINE, INC., formerly known as
Williams Gas Pipelines Southcentral,
Inc.,

        Defendant-Appellee.

No. 05-3228
(District of Kansas)
(D.C. No. 03-CV-2655-GTV)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **EBEL**, and **McCONNELL**, Circuit Judges.

**I. Introduction**

      Phillip G. Cline and Southern Star Central Gas Pipeline, Inc. ("Southern

Star") are parties to a set of contracts concerning oil, gas, and other minerals

underlying Cline's land in northeast Kansas. Cline sued Southern Star in a

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

diversity action in the United States District Court for the District of Kansas. He alleged Southern Star breached its contractual obligations and forfeited its rights under the contracts. He also brought claims for fraud, intentional infliction of emotional distress, and conversion. Southern Star counterclaimed, requesting a judgment quieting title to certain natural gas and other property and seeking a declaratory judgment stating its agreements with Cline remained valid. The district court eventually granted summary judgment in favor of Southern Star on all claims and counterclaims. Cline appeals the district court's judgment. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms**.

## II. Background

Cline owns property within the boundaries of the McLouth Storage Field, an underground natural gas storage field in Jefferson County, Kansas. When Cline acquired the property, it was subject to an oil and gas lease, a gas storage lease, and an acknowledgment of payment (collectively "gas storage contract"). Cline's predecessors and Cities Service Gas Co. ("Cities Service") executed these agreements on June 16, 1951. Southern Star is the successor-in-interest to Cities Service, and is the current owner of the McLouth Storage Field and the gas storage and oil and gas interests associated with Cline's property.

In the 1951 gas storage contract, Cities Service agreed to provide a limited amount of gas, free of charge, to Cline's predecessors. The gas storage contract provided that Cline's predecessors "or their assigns, shall lay and maintain in good

condition the necessary service lines and appurtenances to receive and utilize the gas so delivered, all at their sole cost, risk and expense." App. at 110.

Cline first expressed interest in obtaining free natural gas in November 1978. At that time, Cline wrote to Cities Service and asked whether he could tap his neighbor's gas well and run a gas line to his farm. Cities Service approved Cline's request, but told him it would need to obtain federal regulatory approval before providing service to his property. It also told Cline he would be required to pay a $350.00 connection charge fee, along with $10.50 in state taxes and a $10.00 security deposit. Although Cities Service obtained federal approval, sent Cline the necessary application, and notified Cline before the federal approval was set to expire, Cline took no further action at that time.

In October 1988, Cline wrote a letter to Cities Service's successor, Williams Natural Gas Co. ("Williams Natural"). The letter stated,

> When I purchased this land I was given permission to connect to a gas line, is this still permissible? I am living in a mobile home and would like to drill a gas well or hook on to the line per our agreement.
> When I was told I could connect to a gas line I did not have the money to do so, but now my finances are such that I can afford to drill a gas well.

App. at 299. Williams Natural approved Cline's request in a letter dated November 2, 1988. The letter informed Cline he was responsible for paying a connection fee in the amount of $350.00 plus sales tax. It also advised Cline that he was responsible for constructing a service line from his property to its pipeline

-3-

at his expense, and that he would need to obtain easements from his neighbors if the service line crossed their land. Again, Cline took no immediate action.

Cline next contacted Williams Natural in November 1991, when he asked for a copy of the gas storage contract covering his land. In response, Williams Natural sent Cline a copy of the gas storage contract along with another letter informing Cline that, to obtain free gas, he was required to construct a service line at his own expense, secure easements from his neighbors, and pay the $350.00 connection fee.

In April 1992, Cline wrote to Williams Natural and accused it of refusing to honor the free gas provision of the gas storage contract. Cline informed Williams Natural he was willing to go to court to enforce his rights. He warned, however, that if the court ruled against Williams Natural, it could be a "financially crippling blow" to the company. App. at 307. Cline stated Williams Natural could avoid the risk of litigation by installing, at its expense, a service line to his property and by forever providing free gas, for any use, to him and his family. In reply to Cline's letter, Williams Natural told Cline he could construct a service line, connect to the company's pipeline, and use gas according to the terms and conditions of the gas storage contract.

Cline filed suit against Williams Natural in state court in December 1995. He alleged Williams Natural breached the gas storage lease by failing to make rental payments in 1992 and 1993 and by unlawfully storing gas under his property

-4-

since October 1992. Williams Natural removed the suit to federal court. The parties eventually agreed to dismiss the case with prejudice, stipulating that Williams Natural timely made all annual payments and that the gas storage lease continued with full force and effect.

In October 1998, Cline sent Williams Natural a check for $368.38 and a signed application to connect to the company's pipeline. Williams Gas Pipeline Southcentral, Inc. ("Williams Gas"), Williams Natural's successor, acknowledged Cline's check and application in a letter dated November 4, 1998. The letter advised Cline he needed to make arrangements with his neighbors to run a service line across their land. Moreover, it informed Cline that due to governmental safety regulations, Williams Gas was no longer allowing customers to construct their own service lines; the company instead required third-party contractors to perform the work. Also, because of changes in the costs of making service line connections, Williams Gas told Cline it now charged the actual cost of connecting a service line and installing the metering facilities instead of charging a $350.00 flat fee. Williams Gas informed Cline that, if he obtained the necessary right-of-way to connect to its pipeline, he would also need to submit in advance a $5000 deposit to cover construction of the metering facility, service line, and connection tap. If the actual cost of construction fell below $5000, Williams Gas would issue a refund to Cline. If the costs exceeded that amount, Williams Gas would charge Cline for the additional costs.

Cline responded to Williams Gas in November 1998 and questioned the new costs, but took no further action at that time. Cline submitted another request for a gas tap connection several years later. In a letter dated April 4, 2001, Williams Gas approved the request, so long as Cline secured permission to set a meter on his neighbor's property, signed an Application for Transportation Contract, paid a $5000 tap installation fee, and employed a contractor certified by the Department of Transportation to install the service line. Williams Gas also informed Cline that under the terms of the gas storage contract, he was entitled to a limited amount of free gas, and that the free gas could be used only for his residence, not for his barns. In July 2002, Williams Gas sent Cline a copy of its April 4, 2001 letter after Cline made yet another request for information about installing a gas tap on his property.

In September 2003, Cline sent a letter to Williams Gas' successor, Southern Star. Cline asserted Southern Star's requirement that he pay a $5000 tap installation deposit constituted a violation of the free gas provision in the gas storage contract. Cline informed Southern Star he would file suit against the company unless it provided him with a connection to its pipeline without any conditions or charges and compensated him for gas it had denied him in the past.

Cline filed suit in federal district court in December 2003, alleging breach of contract, fraud, intentional infliction of emotional distress, and conversion. Southern Star counterclaimed. It sought a judgment quieting title in oil, gas, and

mineral interests underlying Cline's land and any wells, pipelines, or other property it placed on Cline's property. Southern Star also sought a declaratory judgment stating that it had not breached its agreement to provide free gas to Cline and that its gas storage lease remained valid. It also asked the district court to declare the terms and conditions Cline must satisfy to receive free gas in the future.

Southern Star moved for summary judgment. The district court determined Cline's contract and tort claims were barred by the applicable Kansas statutes of limitations. In the alternative, the court concluded Cline's contract and tort claims failed on their merits. The district court granted Southern Star's counterclaim for declaratory judgment, but denied its quiet title claim because neither of the parties had furnished the court with a legible copy of the oil and gas lease, and because neither party explained the significance of a provision in the gas storage lease that concerned Cline's royalty interests in oil and gas developed under his property.

Both parties filed motions to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. The district court denied Cline's motion. After examining a legible copy of the oil and gas lease, the district court reconsidered its ruling on Southern Star's quiet title counterclaim; it held Southern Star was entitled to an order quieting title to the gas, oil, and other minerals under Cline's property.

**III. Analysis**

Cline appeals the summary judgment. He asserts the district court erred when it determined his contract and tort claims were barred by the applicable statutes of limitations and when it concluded his contract and tort claims failed on the merits. He also contends the district court erred when it determined Southern Star did not forfeit its gas storage lease. Lastly, he claims the district court erred when it quieted title in favor of Southern Star.

"This court reviews *de novo* a district court's grant of summary judgment." *Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762, 765 (10th Cir. 2006). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law." *Holt*, 443 F.3d at 765 (quotation omitted).

*A. Statute of Limitations: Breach of Contract, Fraud, and Intentional Infliction of Emotional Distress Claims*

In his Reply Memorandum Opposing Summary Judgment, Cline asserted Southern Star and its predecessors breached their gas storage contract by creating obstacles, such as the $5000 connection deposit, which prevented him from receiving free gas. The district court determined Cline's breach of contract claim accrued more than five years before he filed his complaint in district court and

therefore was barred by Kan. Stat. Ann. § 60-511(1), a five-year statute of

limitations applicable to actions on contracts in writing. On appeal, Cline asserts

the district court's conclusion was in error.

Cline attempts to circumvent the statute of limitations by arguing that each

of his requests for free gas made in the five years before he filed suit gave rise to

new and independent causes of action. He contends these new causes of action

accrued less than five years before he filed suit and therefore are not barred by §

60-511(1). Although Cline's argument is not a model of clarity,[1] he appears to

advance two theories in support of his contention: a "temporary injury" theory and

a "continuing contract" theory.

First, Cline argues the gas company's responses to his requests for free

gas—namely its assertions he was required to pay a connection fee or deposit in

order to receive the gas—constituted a series of temporary injuries, each of which

gave rise to a new and independent cause of action. Kansas courts have

recognized a temporary injury theory in nuisance actions, where a plaintiff suffers

temporary, occasional, or recurrent physical damage to his real property. *See, e.g.,*

*Dougan v. Rossville Drainage Dist.*, 15 P.3d 338, 346 (Kan. 2000) (allowing

---

[1]Cline fails to articulate a cogent argument in support of his position. The argument section of Cline's brief-in-chief contains a number of lengthy quotations, but provides us with little guidance as to how the quoted material applies to his contentions. Our understanding of Cline's arguments is further hindered by his failure to include in his brief a summary of his argument. *See* Fed. R. App. P. 28(a)(8).

independent causes of action for periodic episodes of flooding); *Henderson v. Talbott*, 266 P.2d 273, 281 (Kan. 1954) (recognizing separate causes of action for injuries to plaintiff's land caused by occasional flooding). Cline has cited no case, however, in which a Kansas court has applied the concept of temporary damages to a claim for breach of contract. We therefore conclude Cline's temporary injury argument is without merit.

Second, Cline advances a continuing contract theory. He characterizes Southern Star's contractual obligation to deliver free gas as a form of rent; he contends Southern Star and its predecessors failed to pay this rent because they asserted Cline was required to pay a connection fee or deposit before becoming eligible to receive free gas. Under this continuing contract theory, Cline alleges a new breach of contract claim accrued each time Southern Star or its predecessors did not pay rent in the form of delivering free gas.

Kansas recognizes that "an obligation to make periodic payments is a severable obligation, so that for limitations purposes each period for which a payment is due is considered separately." *Goff v. Aetna Life & Cas. Co.*, 563 P.2d 1073, 1078 (Kan. Ct. App. 1977). The issue in Cline's breach of contract claim, however, is not whether Southern Star and its predecessors refused to make a series of separate periodic payments in the form of free gas. The gas storage contract does not provide for periodic payments of gas. Instead, the issue is whether the gas company dishonored its agreement at the outset, when it insisted

Cline pay a connection fee before providing him with free gas. The company's adherence to this position in the face of Cline's later requests does not give rise to a series of separate causes of action. *See Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998) ("[T]he continuing claims doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time."). In short, this court is unpersuaded by Cline's arguments that a new cause of action accrued each time Southern Star or its predecessors rejected his requests for free gas.

Under Kansas law, the statute of limitations begins to run when "the plaintiff could first have filed and prosecuted his action to a successful conclusion." *Pancake House, Inc. v. Redmond ex rel. Redmond*, 716 P.2d 575, 579 (Kan. 1986). In contract disputes, the cause of action accrues "once a plaintiff realizes that a defendant has no intention of honoring an agreement." *Johnson v. Kan. Pub. Employees Ret. Sys.*, 935 P.2d 1049, 1054 (Kan. 1997). Accordingly, we conclude Cline's cause of action accrued at the time he realized the gas company was going to demand a connection fee or deposit before providing him with free gas.

Beginning in 1978, Southern Star's predecessors told Cline he would need to pay a connection fee before they would supply him with free gas. In its letter dated November 4, 1998, Williams Gas told Cline in unmistakable terms it would not provide him with free gas until Cline paid a $5000 connection deposit charge.

-11-

Cline should have realized the gas company's intentions, at the very latest, when he received the November 4 letter. Thus, a single cause of action accrued, and the statute of limitations began to run, no later than that time. Because Cline filed his breach of contract claim more than five years after his receipt of the November 4 letter, and because no independent causes of action arose after his receipt of the November 4 letter, Cline's breach of contract claim is barred by Kan. Stat. Ann. § 60-511(1).

In addition to his breach of contract claim, Cline claims the gas company's insistence that he pay a connection fee or deposit gave rise to claims for fraud and intentional infliction of emotional distress. Under Kansas law, these claims are governed by a two-year statute of limitations. Kan. Stat. Ann. § 60-513(a)(3)–(4). A claim for fraud does not accrue "until the fraud is discovered." *Id*. § 60-513(a)(3). "Under Kansas law, a fraud is discovered at the time of actual discovery or when, with reasonable diligence, the fraud could have been discovered." *Waite v. Adler*, 716 P.2d 524, 527 (Kan. 1986). A claim for intentional infliction of emotional distress accrues "on the date when the injury was incurred and the emotional impact was felt." *Moore v. Luther ex rel. Luther*, 291 F. Supp. 2d 1194, 1199 (D. Kan. 2003). The district court determined Cline's fraud and intentional infliction of emotional distress claims accrued more than two years before he filed suit against Southern Star. It therefore concluded the statute of limitations barred these claims and granted summary judgment to Southern Star.

On appeal, Cline argues his fraud and intentional infliction of emotional distress claims are not barred by the statute of limitations because they concern temporary, not permanent, injuries. He asserts the temporary nature of his injuries creates a continuing claim that is not barred by the statute of limitations. Cline contends the Kansas Supreme Court's discussion of temporary injuries in *Dougan* supports his argument, but fails to explain why this is the case. *See Dougan*, 15 P.3d at 343–46. As noted above, *Dougan* concerns a nuisance action brought because of repeated incidents of flooding. *Id*. at 343. *Dougan*'s discussion of temporary and permanent injuries is explicitly grounded in the context of "damage actions from flooding caused by construction." *Id*. at 344. Accordingly, it has no application to Cline's claims for fraud and intentional infliction of emotional distress.

We agree with the district court's conclusion that Cline's claims for fraud and intentional infliction of emotional distress accrued more than two years before Cline filed suit against Southern Star. Cline's argument to the contrary is wholly unpersuasive. This court therefore concludes these tort claims are barred by the applicable statute of limitations.

Because both Cline's breach of contract claim and his fraud and intentional infliction of emotional distress claims are barred by the applicable statute of limitations, it is unnecessary to address the merits of those claims. Similarly, because Cline's forfeiture argument concerns only the measure of damages owed

him for breach of contract, and because Cline's breach of contract claim is barred by the statute of limitations, it is unnecessary to address the merits of Cline's forfeiture argument.

*B. Conversion Claim*

In addition to his other tort claims, Cline argues Southern Star and its predecessors committed the tort of conversion. Southern Star conceded at oral argument that Cline's conversion claim was not barred by the statute of limitations. We therefore address the merits of Cline's conversion claim to determine whether the district court properly granted summary judgment to Southern Star.

Under Kansas law, "[c]onversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005). In his complaint and in the pretrial order, Cline claimed his property had produced natural gas in the past, and continued to produce natural gas. He asserted Southern Star comingled its injected natural gas with the native natural gas produced on his property and converted his native gas to its own use. In its Motion for Summary Judgment, Southern Star alleged there was no evidence to support Cline's conversion claim. After reviewing Cline's conversion claim, the district court concluded Cline's allegations were not supported by evidence in the record, and granted summary judgment to Southern Star. On appeal, Cline

reasserts his argument that Southern Star committed the tort of conversion because it exerted control over his land and mineral rights outside the boundaries of its leasehold.

"To withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *L&M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) (quotations omitted). "Unsupported conclusory allegations . . . do not create a genuine issue of fact" sufficient to survive summary judgment. *Id.* In the instant case, there is no evidence in the record to suggest Cline's land has produced native gas or that such gas—if it has been produced—has comingled with Southern Star's injected gas. Instead, the record reveals that, in signing the gas storage contract, Cline's predecessors stipulated there was no gas underlying the property at the time the contract was signed. Moreover, Cline's own expert witness indicated he was not aware of any gas production on Cline's property, and that if native gas exists on Cline's property, it is not comingled with the gas Southern Star has stored there. In short, the record is wholly devoid of support for Cline's conversion claim. Because Cline did not satisfy his burden to come forward with specific facts showing there is a genuine issue for trial, we conclude the district court did not err when it granted Southern Star's motion for summary judgment on this issue.

*C. Quiet Title*

In its Memorandum and Order on the parties' Rule 59(e) motions, the district court held Southern Star was entitled to an order quieting title

> to all natural gas injected into the Storage Zone by Southern Star, to any other natural gas, oil or other minerals under the Subject Property (other than a potential royalty interest in minerals that might be produced in the future by Southern Star, if any, from greater than twenty feet (20') below the top of the Mississippi Lime) and to any wells, pipelines or other property that Southern Star has placed on the Subject Property.

App. at 720. On appeal, Cline contends the district court's quiet title holding was erroneous. Cline raises three arguments in support of this contention.

First, Cline argues the district court erred in issuing its quiet title order because it incorrectly determined the gas storage contract allowed Southern Star and its predecessors to charge Cline a connection fee or deposit before providing him with free gas. The validity of Southern Star's connection fee or deposit requirement would be relevant if the question at issue was whether Cline had done all that was necessary to receive free gas under the gas storage contract. The validity of Southern Star's connection fee or deposit requirement has no bearing, however, on ownership interest in the oil, gas, and other minerals underlying Cline's property and therefore has no bearing on the district court's quiet title order.

Second, Cline claims the district court failed to comport with applicable Kansas law when it concluded the gas storage contract granted Southern Star the exclusive right to produce oil, gas, and other minerals from Cline's property.

-16-

Cline asserts that under Kansas law, Southern Star's rights to store gas do not restrict his ability to produce oil and gas outside the boundaries of the storage lease. The district court decision upon which Cline bases his argument, however, was reversed by this court on appeal.[2] Cline's assertion is therefore entirely unpersuasive.

Third, Cline argues the district court erred by using a lease term related to royalties from gas production when interpreting the terms of the gas storage lease. Cline fails to explain how the district court committed the purported error and fails to explain the significance, if any, of the purported error. Because Cline failed to explain the substance of his argument, we will afford it no further consideration. *See Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 (10th Cir. 1992) (noting that a party must advance a "reasoned argument as to the grounds for the appeal").

After reviewing the terms of the gas storage contract, this court agrees with the district court's characterization of the ownership interests at issue: Southern

---

[2]Cline cites to the district court's decision in *Reese Exploration, Inc. v. Williams Natural Gas Co.*, 768 F. Supp. 1416 (D. Kan. 1991). *Reese* is somewhat analogous to the instant case; it concerned a defendant's right to store gas and a plaintiff's right to produce oil from the same property. *Id*. at 1423. The district court in *Reese* concluded the plaintiff and defendant had co-existing rights, neither of which was superior to the other. *Id*. This court, however, reversed the district court's decision on appeal. *See Reese Exploration, Inc. v. Williams Natural Gas Co.*, 983 F.2d 1514, 1524 (10th Cir. 1993). We held the parties' rights were not coequal; instead, the plaintiff's right to produce oil was subject to the defendant's right to store gas. *Id*. at 1522. Therefore, to the extent the district court's decision in *Reese* supported Cline's quiet title claim, that support was nullified by this court's decision on appeal.

Star has "the exclusive right to produce oil, gas and other minerals underneath [Cline's] property," and Cline retains "royalty interests in those formations outside the formations leased to [Southern Star] for gas storage." App. at 720. Cline's arguments to the contrary are unpersuasive or without merit. We therefore conclude the district court did not err when it ordered that title be quieted in Southern Star's favor.

**IV. Conclusion**

For the foregoing reasons, this court **affirms** the decision of the United States District Court for the District of Kansas.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge