(57 P.3d 538)
No. 87,075

ROOF-TECHS INTERNATIONAL, INC., *Plaintiff-Appellant/Cross-Appellee*, and CENTRAL MECHANICAL CONSTRUCTION CO., INC., and D.L. SMITH ELECTRICAL CONSTRUCTION, INC., *Plaintiffs-Appellees/Cross-Appellants*, v. THE STATE OF KANSAS, THE LAW COMPANY, INC., and UNITED STATES FIDELITY & GUARANTY COMPANY, *Defendants-Appellees/Cross-Appellants*, and BRENT BOWMAN AND ASSOCIATES ARCHITECTS, P.A., *Defendant-Appellee*.

Opinion filed November 1, 2002.

*Bill H. Raymond,* of Bill H. Raymond, P.A., of Wichita, for the plaintiff-appellant/cross-appellee Roof-Techs International, Inc.

*James D. Oliver, Wyatt A. Hoch, Trisha A. Thelen,* and *Caleb Stegall,* of Foulston & Siefkin L.L.P., of Topeka, for the defendant-appellee/cross appellee, Brent Bowman and Associates Architects, P.A.

*Ron Campbell* and *Lyndon W. Vix,* of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for the defendants-appellees/cross-appellants, The Law Company, United States Fidelity & Guaranty Company, and the State of Kansas.

*Stewart Entz* and *Michael Entz,* of Entz & Entz, P.A., of Topeka, for the plaintiffs-appellees/cross-appellants Central Mechanical Construction Co., Inc., and D.L. Smith Electrical Construction, Inc., and the defendant-appellee/cross-appellant State of Kansas.

*William A. Larson* and *Timothy A. Schultz,* of Gehrt & Roberts, Chartered, of Topeka, for *amicus curiae,* The Associated General Contractors of Kansas. Inc.

Before RULON, C.J., PIERRON, J., and STEPHEN D. HILL, District Judge, assigned.

PIERRON, J.: Roof-Techs International, Inc. (Roof-Techs) appeals from the district court's decision to grant summary judgment in favor of The Law Company, Inc. and its insurance company, United States Fidelity & Guaranty Co.(Law); the State of Kansas (State); and Brent Bowman and Associates Architects, P.A. (BBA). The district court found Roof-Techs' claims were barred by the statute of limitations. Central Mechanical Construction Co., Inc. (Central); D.L. Smith Electrical Construction, Inc. (Smith); the State; and Law collectively appeal from the court's decision to grant summary judgment in favor of BBA. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

This case arises out of the renovation and expansion of Farrell Library on the campus of Kansas State University. The State was

the owner, BBA was the architect, Law was the general contractor, and Central, Smith, and Roof-Techs were subcontractors.

The complex facts and issues of this case must be set out in detail for there to be an understanding of the eventual ruling. More than one reading may be necessary.

In November 1992, BBA entered into a contract with the State to provide architectural design and construction administration services for the Farrell Library Expansion and Renovation Project (the project). In May 1994, Law entered into a contract with the State for construction of the project. Thereafter, Law subcontracted mechanical, electrical, and roofing work to Central, Smith, and Roof-Techs, respectively.

In August 1997, Central filed suit against the State, BBA, and Law to recover damages incurred as a result of delays and problems in the project. The petition set forth a breach of contract claim against Law; a professional negligence claim against BBA; a negligent representation claim against the State, Law, and BBA; and claims for quantum meruit and unjust enrichment against both Law and the State. Central's petition was subsequently amended to add Smith as a plaintiff.

In October 1997, Law answered the suit brought by Central and Smith, and filed a cross-claim against the State. Law's claims against the State were breach of contract, breach of implied warranty, and misrepresentation. The State answered Central and Smith's petition as well as Law's cross-claim. The State asserted cross-claims against both Law and BBA for breach of contract, breach of warranty, indemnity/contribution, and negligence. BBA answered the claims asserted by the State, Central, and Smith, then added a cross-claim against the State for unpaid professional services.

In May 1998, Roof-Techs filed a separate lawsuit which mirrored that of Central and Smith and sought to recover damages sustained as a result of defects in the plans and delays on the project. The petition set forth a breach of contract claim against Law, a professional negligence claim against BBA, and a negligent misrepresentation claim against Law, the State, and BBA, collectively. In Oc-

tober 1998, the Roof-Techs case was consolidated with the Central and Smith case.

In April 2000, BBA filed a motion for summary judgment on the tort claims asserted directly against it by Central and Smith, primarily arguing the claims were barred by the statute of limitations. In June 2000, the State joined BBA's motion and sought summary judgment on the tort claims asserted against the State by Central and Smith. In September 2000, the court granted the motions of BBA and the State, and entered judgment against Central and Smith on the tort claims asserted against BBA and the State.

Central and Smith did not appeal the judgment against them on their tort claims.

In November 2000, BBA filed a motion for summary judgment as to the tort claims asserted against it by Roof-Techs. In December 2000, Law and the State filed a similar motion seeking summary judgment with regard to the tort claims asserted against them by Roof-Techs.

Also in November 2000, Central, Smith, Law, and the State entered into a settlement and liquidation agreement whereby all claims among those parties were settled. As part of the agreement, the State paid $750,000 to settle all claims unrelated to BBA's conduct. The agreement assigned to Law, Central, and Smith all claims the State might have against BBA. In addition, under the terms of the agreement, the breach of contract claims of Central and Smith and Law asserting defects in the architectural plans were purportedly "passed through" the State to be asserted against BBA.

In other words, the agreement intended to allow the contractors to step into the shoes of the State to present their claims directly against BBA. The agreement authorized the contractors to pursue those claims either in their own names or in the State's name.

In December 2000, an amended petition was filed which showed Central, Smith, Law, and the State as plaintiffs and BBA as the defendant. No formal order allowing the amendment was ever entered.

While the motions aimed at Roof-Techs' claims were pending, BBA moved for summary judgment on the State's indemnity claims and also moved to dismiss the amended petition. The motion for

summary judgment alleged that BBA was entitled to judgment as a matter of law on all of the State's cross-claims because the State had failed to designate an architectural expert. The motion to dismiss rested on essentially the same grounds, but added the allegation that the State's indemnity claim should be dismissed because the State had extinguished any obligation to pay the contractors for damages attributable to the conduct of BBA by entering into the agreement with Law, Central, and Smith.

In January 2001, the court granted BBA's dispositive motions with regard to the State's claims. At the same time, the court granted the summary judgment motions of BBA, the State, and Law with regard to the tort claims asserted by Roof-Techs.

The court found that the statute of limitations barred Roof-Techs' claims for negligent misrepresentation against BBA, the State, and Law and also barred its claim for professional negligence against BBA. Concerning BBA's motion for summary judgment against the State, the court found the agreement was not a valid liquidating agreement; it did not assign all claims of the State to Law, Central, and Smith; and the State's failure to designate an expert witness to support its claims against BBA rendered those claims unenforceable and, thus, incapable of assignment. As to BBA's motion to dismiss the amended petition, the court determined the agreement was effective to release the State from liability for any claims for harm that might have been caused by BBA, which rendered the State's indemnity claims inappropriate. Further, the court reiterated its finding the State had failed to identify expert witnesses to sustain its claims against BBA directly. Thus, the court found no remaining legal basis for the amended petition and dismissed it accordingly.

Law, the State, Central, and Smith filed motions to amend the judgment. In addition, BBA filed a motion to "unconsolidate" the two consolidated cases under the theory that the Roof-Techs contract claim against Law could proceed, while the case involving Central, Smith, Law, the State, and BBA would be final and ripe for appeal. On March 12, 2001, the district court denied the motions to amend judgment filed by Law, the State, Central, and Smith. The court also denied the motion to unconsolidate, holding

that "there are no longer any case(s) pending to which the motion to 'unconsolidate' can apply." In so doing, the court presumably disposed of Roof-Techs' contract claim against Law.

On March 26, 2001, Roof-Techs sent a letter to the district court inquiring about the status of its contract claim against Law. The letter stated, *inter alia*: "[I]t appears the decision overrules all claims, including the contract claim of [Roof-Techs]. If this understanding is not correct, please advise." There is no record of any answer from the court. Subsequently, on April 11, 2001, Roof-Techs filed a notice of appeal from the district court's ruling. On April 10, 2001, Central, Smith, the State, and Law filed a joint notice of appeal from the district court's ruling.

" 'Summary judgment is appropriate when the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

The first issue that should be addressed is whether the district court actually granted summary judgment in favor of Law regarding Roof-Techs' contract claim.

It is clear from the record that Law moved for summary judgment against Roof-Techs only on its negligence claims. Law's memorandum in support contains a footnote that states: "[Roof-Techs] has also filed a breach of contract claim against Law which is not addressed in this motion." Subsequently, Roof-Techs filed its response, which did not address the contract claim against Law. The district court granted summary judgment in favor of Law and against Roof-Techs on the negligent misrepresentation claim but

did not direct summary judgment against Roof-Techs on the contract claim against Law.

There is no doubt that all parties were under the impression that Roof-Techs' contract claim against Law was still pending. This is evidenced by the fact that Law specifically excluded the contract claim from its motion for summary judgment as well as the fact that BBA filed a motion to unconsolidate because it also assumed there was still a breach of contract claim by Roof-Techs against Law which had yet to be resolved. It was not until the district court's March 12, 2001, letter decision that it became apparent the court was also dismissing Roof-Techs' contract claim against Law. The letter decision stated: (1) The action was dismissed by order dated January 18, 2001; (2) the court declines to revisit any issue; (3) there are no longer any cases pending to which the motion to unconsolidate can apply; and (4) the letter decision serves as the court's final decision and order, no further journal entry being required.

Although the contract claim was not specifically mentioned in the letter decision, it is clear it was the district court's intention to dismiss all remaining claims. Following the March 12, 2001, decision and after speaking with Law, Roof-Techs submitted a letter to the court stating it appeared its contract claim was dismissed and to please advise if that was not correct. The record is void of any response by the court. The only logical assumption is that the court intentionally disposed of Roof-Techs' contract claim against Law.

On appeal, Law essentially argues that although the district court failed to set forth the basis for its dismissal of the contract claim, Roof-Techs' failure to challenge the sufficiency of the court's ruling is fatal to its appeal. Law cites *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 731, 915 P.2d 80 (1996), in support. In *Farmland*, the cross-appellant argued the district court erred when it found Farmland liable for the tort of intentional private nuisance without making a specific finding the nuisance was intentional. The *Farmland* court stated:

"Although the trial court should state the controlling facts in its decision (Supreme Court Rule 165 [1995 Kan. Ct. R. Annot. 171]), where the court fails to do so

and the litigants fail to object, the trial court is presumed to have found all facts necessary to support the judgment, and omissions in findings will not be considered on appeal. [Citation omitted.]" 259 Kan. at 731.

However, the *Farmland* court then concluded the proper scope of review over the nuisance claim was to determine whether there was substantial competent evidence presented that established intent. Following a brief discussion, the *Farmland* court found the record did not support the presumption that the district court found all necessary facts. The court then held the requisite finding of intent was not supported by substantial competent evidence and reversed the trial court. 259 Kan. at 732-34. In essence, the *Farmland* court ruled the presumption was overcome by the complete lack of evidence of intent.

In the instant case, Roof-Techs' contract claim was dismissed on summary judgment without any explanation and without Law having moved for summary judgment on that claim. The record is void of any reason why the contract claim should have been dismissed on summary judgment. It is uncontested that Roof-Techs had a contract with Law, and it is uncontested that Roof-Techs brought the breach of contract claim within the statute of limitations.

Although the better approach would have been for Roof-Techs to file a motion to amend the judgment, the failure to do so is not fatal to its appeal. It is clear Roof-Techs was unsure whether the journal entry actually disposed of its contract claim because the journal entry was so lacking in substance. This is evidenced by the fact that counsel for Roof-Techs spoke with opposing counsel and sent a letter to the district court in an attempt to clarify the ruling. By that time, the time limit for posttrial motions had passed.

As in *Farmland*, the record in the instant case does not support the presumption that the district court found all necessary facts to support its decision, especially in light of the fact the contract claim was dismissed on summary judgment. The district court must be reversed with directions to reinstate Roof-Techs' breach of contract claim against Law.

Roof-Techs' initial petition contained a professional negligence claim against BBA and a negligent representation claim against Law, the State, and BBA, collectively. The professional negligence

claim was based on the allegation BBA breached its duty of care by failing to provide adequate and accurate drawings and information upon which Roof-Techs had relied in formulating its bid. Additionally, Roof-Techs alleged BBA had failed to timely and adequately respond to requests for information and proposed change orders. The negligent representation claim was based on the allegations that BBA falsely represented that the drawings were adequate and sufficient to allow Roof-Techs to formulate an accurate bid on the project and BBA falsely represented that asbestos would be removed by others prior to the start of work.

Subsequently, BBA, the State, and Law all filed motions for summary judgment against Roof-Techs on the these tort claims, primarily arguing the claims were barred by the 2-year statute of limitations. The district court found Roof-Techs was aware of the discovery of asbestos in July 1995. Roof-Techs became aware it was suffering from delays as a result of the asbestos and change orders no later than the end of 1995. Thus, Roof-Techs' injury was reasonably ascertainable at that time, and its tort claims were barred by the statute of limitations. Further, the court discounted Roof-Techs' contention that the statute of limitations should have been tolled because Roof-Techs had been led to believe it would be able to recover the cost it was incurring from the delays by repricing and performing asbestos removal. Instead, the court found that Roof-Techs had been alerted no later than September 1995 that it would not be conducting additional work.

On appeal, Roof-Techs argues it did not fully comprehend the extent of the delay and damages it had suffered until the summer of 1996. Additionally, Roof-Techs claims that Law and the State enticed it into completing the project and that the additional costs incurred would be reimbursed if it remained on the job. Thus, Roof-Techs contends the district court should be reversed because there is, at a minimum, a question of fact as to when the injury became reasonably ascertainable.

The interpretation and application of a statute of limitations is a question of law for which the appellate court's review is unlimited. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 472, 15 P.3d 338 (2000). When a statute of limitations begins to run is a question

of law over which this court has unlimited review. *Brown v. State*, 261 Kan. 6, 8, 927 P.2d 938 (1996).

All parties agree the claims at issue are governed by the 2-year statute of limitations contained in K.S.A. 2001 Supp. 60-513(a)(4). The rule as to when a cause of action in tort is deemed to accrue is set forth in K.S.A. 2001 Supp. 60-513(b) as follows:

"Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

Here, Roof-Techs claims substantial injury did not occur until some time following the discovery of asbestos of the project site. Thus, under K.S.A. 2001 Supp. 60-513(b), the 2-year statute of limitations began to run at the point in time when the fact of injury became reasonably ascertainable to Roof-Techs. In the case of *Roe v. Diefendorf*, 236 Kan. 218, 689 P.2d 855 (1984), the court determined the application of K.S.A. 60-513(b):

"We hold the use of the term 'substantial injury' in the statute does not require an injured party to have knowledge of the full extent of the injury to trigger the statute of limitations. Rather, it means the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent. An unsubstantial injury as contrasted to a substantial injury is only a difference in degree, *i.e.*, the amount of damages. That is not a legal distinction. Both are injuries from which the victim is entitled to recover damages if the injury is the fault of another. A separate classification for the two, for purposes of limiting actions thereon, is in violation of the Equal Protection clause of the Fourteenth Amendment to the Constitution of the United States, because such classification has no legitimate legislative purpose. [Citation omitted.] It is the duty of the judiciary to construe statutes in such a way, if possible, as to sustain the act's constitutionality. [Citation omitted.] Therefore, we construe the phrase 'substantial injury' in K.S.A. 60-513(b) to mean 'actionable injury.' " 236 Kan. at 222-23.

Roof-Techs' president, Michael Page, testified in a deposition that he was aware asbestos was present in the roof of the project in the summer of 1995. He also testified he was aware that by the end of 1995 that the discovery of asbestos was going to cause some

delay in Roof-Techs' performance. This was further evidenced by a September 1995 letter that Page wrote to Kelly Stillings of Law complaining that the discovery of asbestos had already caused delays and additional costs to Roof-Techs.

Notwithstanding the aforementioned facts, Roof-Techs contends it did not fully comprehend the impact of the delays and damages until the summer of 1996, and the statute of limitations did not commence to run until that time. Page, in his deposition, stated: "[By the end of 1995] I knew that we were delayed. I didn't realize, probably until much later, the full impact of the delays." The fact Roof-Techs may not have fully comprehended the impact of the delays is insufficient to toll the statute of limitations. "[T]he critical information is knowledge of the *fact* of injury, not the extent of injury. [Citation omitted.]" *Bryson v. Wichita State University*, 19 Kan. App. 2d 1104, 1108, 880 P.2d 800, *rev. denied* 256 Kan. 994 (1994).

Further evidence shows that Roof-Techs was sufficiently aware, at the latest, by the spring of 1996, that it had sustained actionable damages as a result of the asbestos-related delays and change orders. On October 26, 1995, Page wrote a letter to Stillings in which he notified Law that Roof-Techs was being greatly delayed on the project due to change orders that were taking an extreme amount of time to be approved. The letter went on to state the change orders were no fault of Roof-Techs but had greatly affected its costs. The letter concluded that Law should notify the State and advise Roof-Techs as to directions for compensation.

On March 4, 1996, Page again wrote Stillings and indicated his belief Roof-Techs had sustained damages which entitled it to compensation. The letter stated: "Roof-Techs will be filing [a] claim, on the referenced project, for cost increases due to owner delays. Cost breakdowns will follow. If you have any questions contact me."

Page's deposition testimony coupled with his letters to Billings clearly establish that Roof-Techs was aware of all the necessary facts to commence the running of the statute of limitations by March 1996. Because Roof-Techs did not file its lawsuit until May 15, 1998, its tort claims are time barred.

Roof-Techs further argues, at least as to its tort claim against Law and the State, that the statute of limitations was tolled because Roof-Techs was enticed into believing it would be compensated for its damages caused by the delays. In support, Roof-Techs cites to the fact it was invited to submit a proposed change order for an amended contract to include payment to Roof-Techs for asbestos removal. However, Roof-Techs knew no later than the end of 1995 the contract for the asbestos removal was awarded to a different company.

Further, Roof-Techs claims it was led to believe it could proceed with a delay claim, which it ultimately did, in order for the project to be completed. Although this is true, Roof-Techs fails to offer any legal authority on why that fact would toll the running of the statute of limitations. The burden of proving facts sufficient to toll the statute of limitations is upon Roof-Techs. See *Slayden v. Sixta*, 250 Kan. 23, 26, 825 P.2d 119 (1992). Roof-Techs has not sustained this burden by demonstrating merely that Law told it to file a delay claim with the State for damages.

The district court did not err in finding Roof-Techs' negligence claims were time barred by the 2-year statute of limitations.

While this case was pending on appeal, Roof-Techs filed a motion with this court requesting attorney fees and expenses incurred while responding to BBA's motion for clarification of an order from this court that denied the State's and Law's motion for dismissal of the appeal. Roof-Techs claims BBA's motion lacked a factual basis, was frivolous, and had no support in the law.

Without belaboring the point, Roof-Techs' claim is wholly without merit. First, Roof-Techs was not even required to respond to the motion for clarification. Second, the motion for clarification apparently had some merit because it was granted in an order from this court. Finally, as required by Supreme Court Rule 7.07(b) (2001 Kan. Ct. R. Annot. 52), Roof-Techs did not attach an affidavit to the motion specifying "(1) the nature and extent of the services rendered; (2) the time expended on the appeal; and (3) the factors considered in determining the reasonableness of the fee. (See KRPC 1.5 Fees.)"

We turn to the question of the effect of the State's failure to name an expert in the normal fashion.

For a large majority of the time this case was pending, up until the execution of the liquidation agreement, the State was not necessarily adverse to BBA. The State's claims against BBA rested in breach of contract, breach of implied warranty, indemnity, and negligence. However, at the outset, the State took the position the contractors were owed nothing. As between BBA and the State, the State did not come forward in discovery with any evidence in support of a claim against BBA. The State did not retain or designate an expert witness to testify to any violation of the duties and standard of care between BBA and itself, or to causation of any damages to itself.

The deadline for the State and BBA to name experts and provide their reports, as required by K.S.A. 2001 Supp. 60-226(b)(6), was September 29, 2000. In October 2000, the district court entered an order directing the parties to exchange pretrial questionnaires by October 26, 2000. The State declined to submit a pretrial questionnaire setting forth any theory of a claim, damages, witnesses, or exhibits in support of a claim against BBA.

BBA filed its motion for summary judgment against the State on October 31, 2000. BBA moved to dismiss the State's claims on the basis the State had no expert testimony to establish the standard of care, breach of the standard of care, or proximate cause. That expert testimony was needed to establish liability on the part of BBA was never, and is still not, disputed. The State never made a motion for permission to designate an expert out of time and/or to file a pretrial questionnaire out of time.

It is worth noting, as Law's brief points out, that until the liquidation and settlement agreement came into existence, it would have been quite illogical for the State to designate an expert. The source of Law's claim against the State was the *Spearin* doctrine (*United States v. Spearin*, 248 U.S. 132, 63 L. Ed. 166, 39 S. Ct. 59 [1918]), which held an owner of a construction project impliedly warrants the contract documents, including but not limited to the plans, are accurate and suitable such that the contractor can perform its work in accordance therewith. The State's claim against

BBA asserted that if the plans were defective, the ultimate responsibility should lie with BBA. Thus, designation of an expert by the State to prove BBA's liability would have also proved its own liability to the contractors.

In November 2000, the State, Law, Central, and Smith entered into a contract among themselves entitled "Settlement and Liquidation Agreement." The agreement purported to assign the State's claims against BBA to the remaining parties and to authorize the remaining parties to pursue the assigned claims in the name of the State or in their own name. Further, the agreement provided the State would pay $750,000 to settle its claims with Law, Central, and Smith. The parties to the agreement then discharged each other from liability for all claims among themselves, except to the extent of the amount recovered from BBA.

Law advised the district court of the agreement at the pretrial conference on December 7, 2000, and from that point forward, Law filed responses to BBA on behalf of the State. That same day, Law filed a response to BBA's motion for summary judgment against the State, asserting the motion was moot because the contractors now stood in the shoes of the State and were prosecuting their claims through the State. Accordingly, the contractor's experts were now the State's experts. It is worth noting that at this point in the litigation, neither Law, Central, nor Smith had any claims pending directly against BBA.

On December 11, 2000, Law attempted to file an "Amended Pretrial Questionnaire" on behalf of the State. Of course, the State had never filed an original pretrial questionnaire. In this document, Law attempted to include the State in Law's theories of recovery against BBA and attempted to designate the contractor's witnesses, including their experts, to testify on behalf of the State.

The district court deferred consideration of a pretrial order and focused on the merits of BBA's summary judgment motion, issuing its ruling on January 18, 2001. The court found the agreement among Law, the State, Central, and Smith was not really a liquidation agreement as the parties had captioned it, but rather an attempted assignment of the State's claim, which was subject to

summary judgment because the State lacked admissible evidence sufficient to raise a genuine issue of material fact. The court ruled:

"In the case at bar, the State lost its ability to recover against BBA when it failed to timely designate experts (which all parties concede were necessary to prove the State, Law and/or the Subcontractors' claims). Thus, the State cannot agree to bring an action against BBA for the claims of Law and the Subcontractors, the proceeds of which it would 'pass through' to Law and the Subcontractors. The State has no remaining enforceable claims against BBA at all."

Preliminarily, all claims against BBA not brought by the State have been dismissed. Law, Central, and Smith have not appealed the dismissal of their negligence claims against BBA. It follows that any claim against BBA must go through the State. Thus, the first issue that needs to be discussed is the question of whether the district court erred when it found the State lost its ability to recover against BBA by failing to timely designate any experts. If the district court was correct when it found the State had no remaining enforceable claims against BBA, then it would logically follow the settlement and liquidation agreement would be of no consequence because either the State could not assign what it no longer had, or Law, Central, and Smith could not prosecute any claims through any State claims that no longer existed.

The district court granted summary judgment in favor of BBA because the State failed to comply with discovery deadlines and failed to designate an expert, which was needed to prove liability against BBA. This decision will not be disturbed on appeal absent an abuse of discretion. See *Olathe Mfg., Inc. v. Browning Mfg.,* 259 Kan. 735, 768, 915 P.2d 86 (1996) (reviewing the trial court's decision to exclude expert testimony based on late disclosure).

In its brief, Law's (and the State's) entire claim is based on the premise that one party may use another party's expert to establish the standard of care. Law cites case law purportedly standing for the proposition that as a general rule, a party is not precluded from calling as its own witness an expert who has been retained and identified by the opposing party. Thus, according to Law, the State should have been permitted to call the experts previously identified by the contractors, presumably because the pretrial questionnaire filed by the State indicated it intended to call those experts.

The legal authority cited by Law is not controverted. Although it does stand for the proposition that one party may use another party's expert witness, the flaw in Law's argument is the fact that in the cited case law, those parties had timely designated the adverse parties' witnesses on the pretrial order. Here, the State did not. A pretrial questionnaire identifying expert witnesses was not filed on behalf of the State until after BBA moved for summary judgment due to the lack of designated experts. Further, there was never a motion filed on behalf of the State asking the court to allow it to designate an expert after the close of discovery.

Law argues that under the district court's ruling, a liquidation and settlement agreement could never be entered into after the deadline for designating experts has passed because the party through whom the claims would have been passed would not have designated a liability expert. Law then claims that if the party through whom the claims are to be passed cannot rely upon experts previously designated by the injured parties, the injured parties will obviously not be interested in a liquidation agreement because such agreements are predicated on the availability of the pass-through claim process.

Although this may be true, it does not fully excuse the State's lack of diligence in prosecuting its claims against BBA. The State could have, and probably should have, either sought an agreement with the contractors before the close of discovery, then designated the contractors' experts as their own in a timely manner, or filed a motion with the court for an extension of time to complete discovery and designate experts. In the instant case, the State did neither.

It must still be determined if the trial court abused its discretion when it granted summary judgment against the State for failing to timely designate an expert witness.

"In determining whether to exclude witnesses not disclosed in compliance with the scheduling order, the Court must consider four factors: 1) the reason for failing to name the witness, 2) the importance of the testimony, 3) potential prejudice in allowing the testimony, and 4) the availability of a continuance to cure such prejudice. [Citations omitted.]" *Potomac Elec. Power v. Electric Motor Supply,* 190 F.R.D. 372, 377 (D. Md. 1999).

The reason the State failed to designate an expert is self-evident. As stated earlier, if the State had retained an expert to prove lia-

bility on the part of BBA, it would have necessarily proved its own liability with respect to Law's claim against it. However, once the agreement was entered into with Law, Central, and Smith, the State was free to retain an expert. The State tries to paint a picture that it was in a "Catch-22" situation. However, if the State had settled prior to the closure of discovery, it could have avoided these problems. The importance of the testimony is equally as obvious. Without an expert, the State cannot prove liability against BBA.

BBA does not really allege prejudice. The contractors' architectural expert opined that BBA deviated from the standard of care and failed to satisfy its contractual obligations, causing damages of over $4.3 million. The expert reports were issued in May 1999. From that day forward, BBA was aware of the evidentiary basis for the allegations against it. BBA also deposed the contractors' experts. BBA knew of the experts, reviewed the experts' reports, deposed the experts, retained a counter-expert, and had ample time to prepare a defense. The fact the experts were not specifically designated by the State caused BBA little, if any, prejudice or surprise. BBA was well aware of its potential liability.

As we will detail below, the uncharted waters created by the kind of settlement and liquidation agreement involved here present new procedural questions. We find that for the reason set out above, the State should be forgiven for not naming an expert in a timely manner, as it would have been illogical for it to do so prior to the settlement and liquidation agreement being reached. While the State should have taken steps to name an expert thereafter, as suggested earlier, no actual prejudice can be seen.

We, therefore, find it was inappropriate for the district court to take the draconian step it did of extinguishing the State's claims for its technical procedural failure under these facts. That portion of the district court's decision is reversed, and the matter will be allowed to proceed.

Due to the novelty of the question, we will expand on our analysis.

"The legal effect of a written instrument is a question of law for the court to decide. On appeal, a written instrument or contract may be construed and its legal effect determined by the appellate court regardless of the construction made by

the trial court. [Citation omitted.]" *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 486, 15 P.2d 338 (2000).

As previously mentioned, the State, Law, Central, and Smith entered into a settlement and liquidation agreement. As part of the agreement, the State paid $750,000 to settle all claims with Law, Central, and Smith that were unrelated to BBA's conduct. The agreement assigned to Law, Central, and Smith all of the claims the State may have had against BBA. In addition, under the terms of the agreement, the breach of contract claims of Central, Smith, and Law asserting defects in the architectural plans were purportedly passed through the State to be asserted against BBA. In other words, the agreement intended to allow the contractors to step into the shoes of the State to present their claims directly against BBA. The agreement authorized the contractors to pursue those claims either in their own names or in the State's name.

The legality of this kind of agreement has been, heretofore, undetermined in Kansas. We note an article from the October 1998 edition of Construction Lawyer: Calvert and Ingwalson, *Pass Through Claims and Liquidation Agreements*, 18 Const. Law 29 (October 1998). The authors provide an excellent summary of the purpose and function of pass-through claims and liquidation agreements:

" 'Pass through claims' are claims by an allegedly damaged party against an allegedly responsible party with whom it has no contractual relationship. These claims are presented by or through an intervening party in privity with both. The most common example of a pass through claim is a claim by a subcontractor arising out of the actions of the owner that is passed through to the owner by the prime contractor. A 'liquidation agreement' is a form of a settlement agreement in which a dispute between two parties with contractual privity is liquidated (settled) on terms delineating the rights, responsibilities, and procedures for presenting a pass through claim to a third party and allocating the costs expended and benefits received when doing so. It is an attempt by the parties to avoid an extra layer of litigation (*i.e.*, litigation between themselves) with its attendant costs and risks by focusing on the party responsible." 18 Const. Law 29.

The agreement at issue in the present case is slightly atypical. Usually, a subcontractor passes its claim against the owner through the general contractor. In the present case, however, the subcontractors and general contractor are passing their claims through the

owner against the architect. As an added twist, the agreement in the instant case purports to assign the State's claims against BBA to Law, Central, and Smith.

BBA extensively briefs the issue of assignment of claims. BBA's main contention is that its contract with the State was one for personal services and Kansas law prohibits the assignment of contracts for personal services without the express consent of both parties. BBA relies on *Alldritt v. Kansas Centennial Global Exposition*, 189 Kan. 649, 371 P.2d 181 (1962), and *Smith & English, Partners, v. Board of Education*, 115 Kan. 155, 222 Pac. 101 (1924). These cases support BBA's contention that Kansas law prohibits the assignment of personal services contracts.

The aforementioned cases, however, do not hold that a cause of action for breach of such contracts cannot be assigned. In fact, the *Alldritt* court expressly held that where the performance of any further personal services under the employment contract at issue were impossible, no consent of the other party was necessary to make the assignment valid. The *Alldritt* court further held that where the assignee's rights in the contract in question were for money damages only, the contract was legally assignable. 189 Kan. at 657-58.

In *Bank IV Wichita v. Arn, Mullins, Unruh, Kuhn & Wilson*, 250 Kan. 490, 827 P.2d 758 (1992), a case cited by BBA, the court discussed the fact that actions for legal malpractice, whether they sound in tort or contract, are not assignable. The court found public policy considerations such as the unique quality of legal services, the personal nature of the attorney's duty to the client, and the confidentiality of the attorney-client relationship precluded the assignment of legal malpractice claims. 250 Kan. at 498-99. The policy considerations expressed in *Bank IV* are not applicable to the instant case.

We find nothing in Kansas law that specifically prohibits the assignment of the State's claims for breach of contract against BBA to Law, Central, and Smith. BBA confuses the issue of whether a contract for personal services can be assigned with whether a breach of contract claim, where the underlying contract was for nonlegal personal services, can be assigned. The former cannot be

assigned, while the latter can. Of course, if the State *had* lost its claim due to its failure to designate, the State would have had no claim to assign.

We also note New York precedent dealing with this issue.

"General contractors on a construction project which have sustained no injury may not bring suit on behalf of a subcontractor for additional costs caused by the owner's delays [citation omitted]. Subcontractors, lacking privity of contract, are precluded from bringing suit against the owners directly [citation omitted]. A liquidating agreement is designed to overcome these legal impediments and allow contractors to bring an action against the owner on behalf of their subcontractors[.]

"Liquidating agreements have three basic elements: (1) the imposition of liability upon the general contractor for the subcontractor's increased costs, thereby providing the general contractor with a basis for legal action against the owner; (2) a liquidation of liability in the amount of the general contractor's recovery against the owner; and, (3) a provision that provides for the 'pass-through' of that recovery to the subcontractor [citation omitted]." *Bovis Lend Lease LMB Inc. v. GCT Venture*, 285 App. Div. 2d 69-70, 728 N.Y.S.2d 25 (2001).

Following *Bovis*, which we find persuasive, it appears the agreement in the instant case accomplished what was intended. In Paragraph 2.1 of the agreement, the State acknowledged its liability to Law, Central, and Smith for claims they asserted against the State based on the acts or omissions of BBA, but only to the extent that Law, Central, and Smith recover from BBA. Further, the State's liability to Law, Central, and Smith, and Law's liability to Central and Smith were liquidated to the amounts recovered from BBA and its insurers. Finally, the agreement contained a pass-through provision whereby the State agreed that Law, Central, and Smith were entitled to any amount recovered on the claims against BBA.

This is not the end of the analysis. The concept of these agreements begins with the fact the subcontractor can sue the general contractor who can then sue the owner. The agreements are intended to avoid an extra layer of litigation. Here, the subcontractors had a claim against the general contractor, who in turn had a claim against the owner, who in turn had a claim against the architectural firm. The subcontractors, general contractor, and owner got together and settled their claims, except for claims related to BBA's

liability, among themselves. At that point, the contractors could have still brought claims against the State based on BBA's liability, and the State could have sought indemnity from BBA. The agreement intended to pass through the contractors' claims against the State and liquidate the amount the State would owe the contractors to what they recovered from BBA. This is needed because the State is the only party in privity with BBA.

Typically, it would be the State who would bring the contractors' claims on behalf of the contractors. It appears the State attempted to avoid this problem by appointing Law's attorneys as special assistant attorneys general for the purpose of this matter, after this case was concluded in the district court and the appeal was in progress. The assignment is also unusual. If the assignment is valid, the contractors, as assignees, could pursue the State's claims, which would have become their own through the assignment, and which, in reality, were initially their own claims anyway.

In its brief, BBA relies heavily on *Severin v. United States*, 99 Ct. Cl. 435 (1943), cert. denied 322 U.S. 733 (1944), and *J.L. Simmons Company v. United States*, 158 Ct. Cl. 393, 304 F.2d 886 (1962).

In *Severin*, the prime contractor brought suit against the government, which was the project owner, alleging damages caused by delays in the project on its own behalf and on behalf of its subcontractor. When speaking as to the prime contractor's ability to recover on behalf of the subcontractor, the *Severin* court stated:

"If [the prime contractor] had proved that they, in the performance of their contract with the Government became liable to their subcontractor for the damages which the latter suffered, that liability, though not yet satisfied by payment, might well constitute actual damages to [the prime contractor], and sustain their suit." 99 Ct. Cl. at 443.

The *Severin* court then found the prime contractor could not recover on behalf of the subcontractor because the two parties had previously entered into a contract with each other wherein they could not be held liable to each other for any delay caused by the owner. Thus, the prime contractor could not show any liability to the subcontractor for breaches of contract by the owner. 99 Ct. Cl. at 443.

In *Simmons*, the prime contractor sued on behalf of its subcontractors for damages caused by the government's alleged breach of contract. Subsequent to completion, the prime contractor and its subcontractors signed a "Subcontractor's Waiver of Lien and Release" which provided the subcontractors' claims would be included in any claim prosecuted by the prime contractor against the government. The agreement also stated that either the disallowance of the subcontractors' claims by the court or the payment to the subcontractors of the amount, if any, that might be recovered would completely extinguish all further obligation of the prime contractor to the subcontractor and would operate as a full and complete release of any and all liability. 304 F.2d at 887-88.

The *Simmons* court then reiterated that under *Severin* and its progeny, a prime contractor may sue the government (owner) on behalf of its subcontractors only "when the prime contractor has reimbursed its subcontractor for the latter's damages or remains liable for such reimbursement in the future." 304 F.2d at 888. The court found that even though the subject provisions were "somewhat inartistic," they did not expressly negate the prime contractor's liability to its subcontractors. Rather, the agreement recognized a liability and set forth the manner in which the prime's liability was to be extinguished by requiring the prime to prosecute the claims. 304 F.2d at 890.

The more recent case of *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221 (10th Cir. 1999), also discusses the requirements of these types of agreements. There, the court stated:

"A settled-but-not-paid requirement, finally, also accords with the long-established rule that a contractor need not pay its sub before making a claim on its behalf. *See George Leary Constr. Co. v. United States*, 63 Ct.Cl. 206, 223, 1927 WL 2960 (1927) ('It is easy to forecast the financial ruin of a Government contractor if the rule is to be established that he may not receive amounts due from the Government under his contract until he establishes . . . that he has paid his subcontractor all he owes him.'); *see also Severin v. United States*, 99 Ct.Cl. 435, 443, 1943 WL 4198 (1943) (holding that, if contractor is liable to sub, 'that liability, though not yet satisfied by payment, might well constitute actual damages to [the contractor], and sustain their suit' under rule that contractor may only sue to recover its own damages). " 175 F.3d at 1250.

The *Morrison* court went on to opine that the *Severin* doctrine is a federal common-law doctrine that prevents a prime contractor from making claims against the government (owner) on its subcontractor's behalf if the subcontractor has released the prime contractor from liability. 175 F.3d at 1251. In discussing the applicability of the *Severin* doctrine, the *Morrison* court stated:

"Courts have strictly limited the *Severin* doctrine, out of reluctance to leave subs with valid claims out in the cold. Courts have applied *Severin* only if the government proves that a sub has executed an ironclad, unconditional release of a prime. [Citations omitted.] Post-*Severin* opinions often interpret releases and contracts very generously in order to let primes press their subs' claims. [Citation omitted.] Those opinions also allow primes to rely on settlements with subs in which the prime's liability is conditional. In such agreements, the sub releases the prime from any liability, and the prime promises only that it will press the sub's claim against the government and pay the sub whatever it recovers. [Citations omitted.]" 175 F.3d at 1251.

In sum, the concept of the instant agreement, at least in theory, seems to be legitimate and seems to follow the general guidelines for pass-through claims and liquidation agreements. There is nothing in the record that indicates any of the parties to the agreement signed any sort of waiver that would implicate a *Severin* problem, *i.e.*, an agreement which released the State from liability to the contractors. The wording in the agreement appears to be sufficient to retain liability on behalf of the State for the amount of recovery against BBA.

Of course, there are also some problems and difficulties with the agreement. Initially, the defendant is not the government, as in most cases discussing these types of agreements. Regardless, the reasoning seems to be equally applicable to private entities. Next, this case has an extra layer of plaintiffs. There is no party in privity with all the other parties. Typically, the prime contractor is in privity with both the subcontractor and the owner (defendant). Here, the prime contractor (Law) is not in privity with the defendant (BBA), and the State, although in privity with the BBA and Law, is not in privity with the subcontractors.

Further problems are what to do about the purported assignment of the State's claims and the issue of who is actually prose-

cuting which claims—the State or Law, Central, and Smith. Typically, the contractors' claims would pass through the State. Here, it at least appears the State's claims are being passed to the contractors. Per the liability issue, it does not appear the State is being forced to prosecute the claims, such as the case in *Simmons*.

We, therefore, affirm the district court's summary judgment as to the tort claims being dismissed due to the statute of limitations.

We reverse the summary judgment as to Roof-Techs' contract claim against Law. We can find no justification for the district court's action.

We reverse the district court's dismissal of the State's claims, and we allow Law to proceed by means of a pass-through process under the facts of this case.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.