F I L E D
United States Court of Appeals
Tenth Circuit

MAY 15 2003

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

CURTIS D. BENNETT,

      Plaintiff-Appellee,

v.

EMERSON ELECTRIC COMPANY,

      Defendant-Appellant.

No. 02-3094

(D.C. No. 00-CV-2335-JWL)

(D. Kansas)

## ORDER AND JUDGMENT[*]

Before **TACHA**, Chief Judge, **BRISCOE**, Circuit Judge, and **SHADUR,** District Judge.[**]

      Plaintiff Curtis Bennett filed suit against his former employer, defendant Emerson Electric Company, alleging various federal and state claims, including breach of implied contract of employment. Bennett prevailed on his breach of contract claim at trial, and the district court subsequently denied Emerson's post-trial motion for judgment as a matter of law, for new trial, or for remittitur. Emerson appeals the denial of that motion.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Milton I. Shadur, Senior District Judge, Northern District of Illinois, sitting by designation.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

Bennett is a resident of Lawrence, Kansas.  From 1988 to 1998, he worked as a sales representative for ShopSmith, a Dayton, Ohio-based company that manufactured and sold a high-end, multi-purpose power tool.  At some point in 1998, Bennett learned that Emerson was introducing a new line of power tools to be sold at Home Depot stores under the brand name RIDGID.  Bennett contacted Emerson about employment.

In late October 1998, Emerson was in negotiations with Home Depot to implement the "Trailblazer" program.  The gist of the program was to promote the RIDGID line of power tools, as well as other tools manufactured by Emerson and sold by Home Depot, by sending specially-equipped tractor-trailer rigs to NASCAR races throughout the nation and to grand openings of Home Depot stores.  Emerson's marketing personnel were to accompany the rigs and conduct public demonstrations of the tools to create a "carnival-type" atmosphere.  Although the program was initially conceived as a one-year agreement between Emerson and Home Depot, it was renegotiated to three years.

Bennett, who was fifty-six years of age, was interviewed by several Emerson executives for a sales/marketing position in the Trailblazer program.  According to Bennett, he informed his interviewers that he was not looking for a short-term position, but was looking for an opportunity to finish his working career.  In response, interviewer Dave Pringle, the president of Emerson's tool division, allegedly stated "No problem."

Suppl. App. at 48. Interviewer Tim Ferry, an Emerson vice-president and general manager, allegedly stated that Emerson had a tentative three-year commitment with Home Depot to market the RIDGID line of power tools. Further, by his own admission, Ferry informed Bennett that it was his intent to keep all Trailblazer employees on board at least for the length of the program.

On November 3, 1998, Emerson sent a letter to Bennett confirming an "offer of employment . . . as National NASCAR/Events Manager reporting to Brian Sponsler, VP, Sales & Marketing - Home Depot." App. at 332. It is uncontroverted that the offer letter was silent as to the intended length of his employment, i.e., whether Bennett would be an employee at will or be hired for a specific length of time. Further, although Emerson's official employment application contained statements notifying applicants they could be terminated at any time for any reason, Bennett was not asked to complete and sign such an application. Bennett accepted the offer and began working for Emerson on or about November 15, 1998.

On November 20, 1998, Bennett leased a vehicle in his own name for business use. According to Bennett, he chose a three-year lease to coincide with the three-year planned length of the Trailblazer marketing program. He personally signed the lease and paid the up-front expenses, with the understanding that his expenses would be reimbursed, at least in part, by Emerson as a monthly automobile allowance.

Within a month of beginning work, Bennett was reprimanded by Sponsler, his

3

immediate supervisor.  Sponsler cited misunderstandings over the allowable automobile allowance, per diem for meals, questions regarding expenses, the hiring of support personnel away from ShopSmith, and personal integrity.  Bennett was again reprimanded by Sponsler on January 11, 1999.  At that time, Sponsler questioned Bennett's "commitment to [his] position and [his] judgement."  App. at 322.  On February 17, 1999, Sponsler terminated Bennett's employment.

Approximately three to four weeks after his employment was terminated, Bennett contacted ShopSmith about returning to work, but ShopSmith had nothing available at that time.  Approximately four months later, ShopSmith contacted Bennett about a part-time field representative position with no fringe benefits.  Bennett accepted the offer and worked in that capacity from August to December of 1999.  In January 2000, he was promoted to a full-time field representative position with fringe benefits.

On July 16, 2000, Bennett was injured in the course of his employment with ShopSmith in Houston, Texas, while he was attempting to load a 250-pound machine into a van by himself.  He sustained injuries to his knee, lower back, and hip.  He unsuccessfully tried to return to work for ShopSmith in September 2000.  According to Bennett, his injuries have medically limited him to lifting no more than twenty pounds and driving no longer than one-half hour at a time.  He has not worked since September 2000, and there is some evidence in the record that he is now considered permanently disabled.

4

Bennett filed suit against Emerson on July 25, 2000, asserting age discrimination, violation of the Kansas Wage Payment Act, fraudulent inducement, negligent misrepresentation, and breach of implied contract of employment. The district court denied Emerson's motion for summary judgment. A jury returned a verdict in favor of Bennett on his breach of contract claim, and judgment was entered in the amount of $236,707.49 on that claim. Emerson filed a post-trial motion for judgment as a matter of law, for new trial, or for remittitur, which was denied in its entirety.

II.

*Denial of motion for judgment as a matter of law*

Emerson contends the district court erred in denying its post-trial motion for judgment as a matter of law. Emerson argues the evidence presented at trial was legally insufficient to support Bennett's claim for breach of implied contract. Emerson also argues that Bennett's evidence of damages was legally insufficient to entitle him "to any lost wages, car allowance or benefits." Aplt. Br. at 25.

We review de novo a district court's ruling on a motion for judgment as a matter of law. See Bangert Bros. Constr. Co. v. Kiewit Western Co., 310 F.3d 1278, 1285-86 (10th Cir. 2002). "Judgment as a matter of law is appropriate only '[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" Id. at 1286 (quoting Fed. R. Civ. P. 50(a)(1)). When we review the record, we "will not weigh evidence, judge

5

witness credibility, or challenge the factual conclusions of the jury." Brown v. Gray, 227 F.3d 1278, 1285 (10th Cir. 2000). Instead, we "consider the evidence, and any inferences drawn therefrom, in favor of the non-moving party." Id.

Breach of implied contract. As noted, Emerson argues the evidence presented at trial was legally insufficient to establish the existence of an implied-in-fact contract of employment. Emerson asserts that any statements made to Bennett during the interview process were, at most, "general platitudes" or "vague assurances" that did not manifest an intent on the part of Emerson to contract with Bennett. Aplt. Br. at 19. Emerson also points to the following evidence which, in its view, demonstrates there was no contract: (1) there was no mention in Bennett's resume that he was seeking a guaranteed contract of employment; (2) the written offer of employment by Emerson to Bennett did not mention a specific term of employment; (3) no other Emerson tool division employee had an employment contract; and (4) after his termination, Bennett wrote a letter to the president of Emerson's tool division stating there "was no doubt when [he] accepted th[e] position that it was for a minimum of one year, with the strong possibility of going two additional years without any problem." App. at 337.

In rejecting Emerson's post-trial motion for judgment as a matter of law, the district court addressed these arguments:

> According to defendant, there is no legally sufficient evidentiary basis for a reasonable jury to have found in favor of plaintiff on his breach of contract claim. In large part, defendant simply rehashes various arguments that it made in support of its summary judgment motion. For

6

example, defendant again emphasizes that Dave Pringle, defendant's president, and Tim Ferry denied making the specific representations that plaintiff alleges they made during his initial interviews with defendant. The court rejected this argument at the summary judgment stage and does so again here. While Mssrs. Pringle and Ferry may have denied making any statements to plaintiff concerning a three-year contract or other term of employment, plaintiff presented evidence to the jury from which it could have reasonably concluded that plaintiff was promised a position with defendant for as long as the Trailblazer program lasted, or a minimum of three years. Plaintiff testified, for example, that he advised Mr. Ferry that he was not looking for a short-term, temporary position and that he wanted an opportunity to "finish out [his] working career." According to plaintiff, Mr. Ferry responded that defendant was going to secure a three-year commitment with Home Depot, suggesting that plaintiff would have a job for at least the duration of the Trailblazer program. In any event, despite his subsequent denials, Mr. Ferry testified in his deposition (testimony that was presented to the jury during plaintiff's case-in-chief) that it was his intent to keep all Trailblazer employees, including plaintiff, on board at least for the length of the program. Mr. Ferry further testified that he may have conveyed that intent to interviewees, including plaintiff. From this evidence, the jury could reasonably find the existence of a three-year contract.

App. at 205-06 (internal citations omitted).

We find no basis for overturning the district court's conclusions. It is significant to note that Emerson has not specifically challenged the court's conclusions, nor has it attempted to refute the evidence relied on by the court. Instead, Emerson points to evidence that could be construed in its favor. Obviously, that is not sufficient to establish it is entitled to judgment as a matter of law when, as here, there is evidence in the record that supports the court's conclusions.

Emerson also contends the evidence presented at trial was insufficient to establish a "meeting of the minds" between Bennett and Emerson regarding all essential terms of

7

the alleged contract. Although not framed as such, this argument appears to amount to a challenge to the district court's jury instructions on Bennett's breach of contract claim. There is no indication in the record on appeal, however, that Emerson specifically challenged the instructions on the breach of contract claim. It is true that Emerson submitted proposed instructions, including an instruction discussing a "meeting of the minds" concept. App. at 77-78 ("if you find that it was not the reasonable belief of both parties that the plaintiff would be employed until his retirement, then you must find that there was no implied-in-fact contract"). However, it is apparent from the record that the district court chose not to use that instruction. Further, although Emerson has included in its appendix a portion of the jury instruction conference, there is no mention therein of the breach of contract instructions. In particular, Emerson made no mention of its proposed instruction, nor did it object to the district court's proposed instruction. Thus, we conclude any challenge to the district court's jury instructions has been waived.

Even assuming Emerson's argument is not a challenge to the district court's jury instructions, we are not persuaded it has any merit. Under Kansas law (which the parties agree is controlling), "there must be a 'meeting of the minds on all essential terms' to form a binding contract." Nicholas v. Nicholas, 66 P.3d 929, 937 (Kan. Ct. App. 2003); Dougan v. Rossville Drainage Dist., 15 P.3d 338, 352 (Kan. 2000) (same). In our view, the evidence cited by the district court is sufficient to establish such a "meeting of the minds." In particular, Ferry's comments to Bennett during the interview process

reasonably could have been perceived by the jury as demonstrating assent to a contract of employment for the intended three-year life of the Trailblazer program.

Finally, Emerson contends that even if the evidence was sufficient to establish the existence of a valid contract, termination of the contract was justified in light of Bennett's failure to properly perform his job duties. It is uncontroverted that Bennett's immediate supervisor reprimanded Bennett on December 11, 1998, and January 11, 1999. However, a review of the trial testimony contained in Bennett's supplemental appendix indicates there were genuine issues of material fact concerning the legitimacy of the criticisms. For example, there were disputed issues of fact concerning whether Bennett adequately performed his job duties at a NASCAR race in Daytona, Florida. Further, the jury was specifically instructed that, in order to prevail on his claim for breach of contract, Bennett had to establish that he "performed or was willing to perform in compliance with the contract." App. at 126 (Instr. No. 19). In light of the jury's verdict, it is clear that the jury resolved this issue in Bennett's favor, and Emerson has failed to meet its burden of demonstrating that the evidence presented at trial was insufficient to warrant the jury's finding.

Damages. Emerson contends that Bennett's testimony regarding his earnings at Emerson and ShopSmith was "contrary to representations made to the Social Security Administration . . . and as set forth on plaintiff's W-2 forms." Aplt. Br. at 25. Thus, Emerson argues that Bennett's evidence "was self-contradictory, unreliable and should be

9

disregarded." Id. Emerson also asserts that "any evidence regarding calculation of benefits should be excluded based upon lack of foundation and inaccurate calculations." Id. Finally, Emerson contends that Bennett "offered absolutely no evidence to establish that he is unable to work or that he is incapable of securing alternative employment." Id. at 29. Emerson contends that Bennett's "lost wages, car allowance and benefits should be cut-off or substantially decreased due to his failure to mitigate." Id.

The district court rejected Emerson's argument regarding the alleged discrepancy between Bennett's testimony and the representations he made to the Social Security Administration on the following grounds:

> With respect to plaintiff's evidence of lost wages, defendant maintains only that plaintiff's evidence was "contradictory" and "unreliable" in that plaintiff's testimony conflicted with representations he made to the Social Security Administration on his application for disability benefits. While defendant attempted to establish at trial that plaintiff's evidence of lost wages was inconsistent, plaintiff explained to the jury the alleged discrepancies between his testimony and his Social Security application. In other words, defendant has already made this argument to the jury and the jury rejected it. In short, there was competent and adequate evidence before the jury regarding plaintiff's wages.

App. at 209-10 (internal citations omitted). There is no basis in the record on appeal to question the court's conclusion or to overturn the jury's verdict on this point. With respect to the issue of lost benefits, the district court stated:

> [D]efendant complains that plaintiff "offered only his own testimony claiming his benefits at Emerson were a percentage of his salary without any foundation for this opinion." This statement is incorrect. While the jury certainly heard plaintiff's testimony regarding his benefits, it also had the opportunity to review Exhibit 12 – a budget prepared by Brian Sponsler

10

that set out specific wages, bonuses, cost of benefits and car allowances for plaintiff and every other Trailblazer employee. Exhibit 12 specifically states that plaintiff's total benefits package was $28,000. During his testimony, plaintiff used Exhibit 12 to present the jury with his lost wages and benefits information. Moreover, defendant did not object to plaintiff's use of Exhibit 12 nor did it present any evidence suggesting that the figures listed on Exhibit 12 were inaccurate. Using Exhibit 12 as a basis, then, plaintiff was permitted to testify that his benefits were "roughly a third" of his total compensation package.

App. at 210-11 (internal citations and footnote omitted). Exhibit 12 is included in the record and appears to support the district court's analysis. In particular, it indicates that Emerson budgeted $28,000 in annual benefits for Bennett's position. Further, as noted by the court, Exhibit 12 supports Bennett's assertion that his benefits at Emerson were "roughly a third" of his total compensation package of $81,000. App. at 211 n.4.

Finally, the district court rejected Emerson's "failure to mitigate" argument on the following grounds:

[D]efendant contends that plaintiff's damages should be substantially decreased because plaintiff failed to mitigate his damages after his discharge from defendant and he has failed to seek alternative employment since his work-related injury in July 2000. With respect to plaintiff's efforts immediately following his discharge from defendant, the burden was on defendant to prove that he failed to mitigate his damages. Defendant devoted very little, if any, time to this point at trial and, ultimately, failed to carry its burden. Moreover, with respect to plaintiff's efforts to find alternative employment after his July 2000 injury, the court – prior to trial – concluded that plaintiff would be entitled to recover the full amount of his loss without any mitigation at all.

11

App. at 213-14 (internal citation omitted).[1]  The record includes portions of Bennett's testimony where he indicated that he was unable to perform the lifting and driving required by his ShopSmith position following his July 2000 injury.  Further, there appears to be sufficient evidence to support the jury's finding that Bennett's "July 2000 injury would not have occurred but for [Emerson's] unlawful termination of [his] employment (i.e., that [Bennett] would not have been injured in July 2000 had he remained employed with [Emerson])."  App. at 153 (verdict form).  Taken together, this evidence appears to rebut Emerson's assertion that Bennett failed to adequately mitigate his post-termination damages.

*Denial of motion for new trial*

Emerson contends the district court erred in denying its alternative motion for new trial.  In support, Emerson cites its arguments in support of its motion for judgment as a matter of law.  In addition, Emerson asserts that (a) it was improper for the jury to rely on Exhibit 12 because it was merely a "*pro forma* budget," (b) the jury's award of lost fringe benefits was inconsistent with Bennett's evidence, and (c) the jury misunderstood the

---

[1] With respect to Bennett's July 2000 injury, the district court also noted it held during the October 29, 2001 telephone conference

> that if plaintiff carried his burden of proof that the . . . injury would not
> have occurred but for defendant's conduct, then "plaintiff would be entitled
> to recovery of the full amount of his loss without mitigation because in fact
> he through no fault of his own was unable to continue to mitigate."

App. at 220.  This legal conclusion has not been challenged on appeal.

employment-at-will doctrine. Because the arguments previously asserted by Emerson have no merit, they will not be revisited.

We review for abuse of discretion a district court's denial of a motion for new trial. Minshall v. McGraw Hill Broadcasting Co., 323 F.3d 1273, 1283 (10th Cir. 2003). We "will reverse the denial of a motion for a new trial only if the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (internal quotations omitted).

Pro forma budget. Emerson contends that Exhibit 12 was simply a pro forma budget, and, as such, constituted no more than an estimate or forecast of what the actual budget might have been. Aplt. Br. at 30. Thus, Emerson contends Exhibit 12 was not reliable evidence of the amount of fringe benefits allegedly lost by Bennett as a result of his termination. The district court addressed and rejected this argument:

> Defendant makes much of the fact that Exhibit 12 was merely a "pro forma" budget. Although Mr. Ferry testified that a pro forma budget is simply a forecast or a rough estimate of expenses, defendant did not offer any evidence that Exhibit 12 was inaccurate or that the expenses actually incurred were somehow different than projected in Exhibit 12. Thus, the jury could reasonably conclude that the expenses listed in Exhibit 12, including plaintiff's benefits information, were accurate.

App. at 210 n.3.

We are unable to verify from the limited record on appeal the district court's statement that "defendant did not offer any evidence that Exhibit 12 was inaccurate or that the expenses actually incurred were somehow different than projected in Exhibit 12."

13

In any event, Emerson does not dispute this statement on appeal and we conclude the district court did not abuse its discretion in rejecting the "pro forma" argument.

Amount of lost benefits. Emerson contends the jury's award of lost benefits bore no relation to Bennett's evidence. More specifically, Emerson asserts the jury calculated Bennett's lost benefits as sixty-eight percent of his wages, even though Bennett's evidence (i.e., Exhibit 12) indicated that his fringe benefits amounted to approximately forty percent of his wages. The district court rejected this argument on the following grounds:

> First, the court does not consider issues and arguments raised for the first time in a reply brief. Second, defendant's comparison is simply not a proper one. The jury was not instructed to base its calculation of plaintiff's lost benefits as a percentage of plaintiff's lost wages and there would be no basis for doing so. During the time period reflected in [verdict] question 7(a), for example, plaintiff's lost wages were not as great because he was earning wages at ShopSmith. For that same time period, however, his lost benefits, by comparison, were great because the benefits he received from ShopSmith were not nearly as favorable as the benefits he received from defendant. By contrast, plaintiff's lost wages during the time period reflected in [verdict] question 7(b) were greater because he was not working at all and was earning no other wages. This, then, explains the difference in the percentages calculated by defendant.

App. at 212 (internal citations omitted). We conclude the district court did not abuse its discretion in reaching these conclusions. Emerson does not dispute the court's analysis (or its statement that the issue was first raised in Emerson's reply brief in support of its motion for new trial). Instead, Emerson restates the arguments it initially presented to the district court.

Jury confusion. Emerson contends that a new trial "is warranted based upon jury confusion as evidenced by" a question sent by the jury to the court during deliberations. Aplt. Br. at 31. More specifically, Emerson contends the "jury question demonstrate[d] the jury's confusion about creation of an implied contract and the general law in Kansas of at-will employment." Id. at 32. Emerson complains that, in responding to the jury's question, "[t]he district court failed to specifically direct the jury to review the instruction on at-will employment, as requested by [its counsel]." Id.

Although this issue is discussed in the context of the denial of Emerson's motion for new trial, we note that the issue was not raised by Emerson in its motion for new trial (nor was it mentioned by the district court in denying Emerson's motion for new trial). Thus, contrary to Emerson's assertions, the issue does not constitute a legitimate basis for granting a new trial. In other words, Emerson has waived the issue to the extent it might constitute a basis for granting a new trial.

Out of an abundance of caution, we will briefly discuss the events giving rise to the issue. During deliberations, the jury sent a note to the district court asking: "In general is there an implied contract between an employee and the employer that the employee is employed until something happens, e.g., retirement, termination, death, layoff, etc.?" App. at 306. The district court noted that it was "a little hard to figure out what [the jury] [was] asking," id., and proposed answering: "Whether or not there is an implied contract and what its terms may be are both questions of fact for you to decide,

15

and the Court is unable to provide you any more detailed answer to your question." Id. at 306-07.

Emerson's counsel requested that the jury be referred to Instruction No. 21 (which discussed an employer's ability to discharge an employee for cause, notwithstanding the existence of an employment contract). Bennett's counsel disagreed, arguing that doing so "would unduly underscore the defendant's position in this case." Id. at 308. The court agreed with Bennett's counsel and overruled defense counsel's objection/suggestion:

> I agree. It's not my practice really to, in the face of a question like this one, that it is not clear what really the thrust of their question may be – I mean, for me to intelligently answer it any more than the answer that I'm proposing would require me to know what they really were driving at here and whether they mean, if you assume there is an implied contract, then what are the terms? And I think that's really what they are talking about, that in the event there were such an implied contract, is there some legal set of terms? I think that – but I'm guessing. And I think that the appropriate thing to do is simply to tell them that they should – that we can't decide that. Perhaps I should tell them both are questions of fact for you to decide under all of the Court's instructions. That at least points them back to the instructions in general – Mr. Hauber points out there are a lot of instructions about contracts here – and the Court's not able to provide you any more detailed answer to your question. That at least gives them that frame of reference to deal with.

Id. at 309.

Contrary to Emerson's assertion, the jury's question does not necessarily indicate it was confused about the law that applied to Bennett's breach of contract claim. Indeed, as noted by the district court, it is unclear precisely what the jury was asking. Considered in context, the court acted well within its discretion in responding to the jury's question. See

16

Allen v. Minnstar, Inc., 97 F.3d 1365, 1370 (10th Cir. 1996) ("A district court's actions in responding to questions from the jury, as well as supplemental instructions given to the jury, are reviewed for abuse of discretion.").

*Denial of motion for remittitur*

Emerson contends the district court erred in denying its alternative motion for remittitur. Emerson asserts the damages awarded by the jury for lost wages, benefits, and car allowance were not supported by the evidence. In addition, Emerson asserts the court failed to reduce the amount of lost wages, benefits, and car allowance "by interim earnings or because of plaintiff's failure to mitigate." Aplt. Br. at 32.

We review a district court's ruling on a motion for remittitur for abuse of discretion. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1257 (10th Cir. 2001). To establish an abuse of discretion in this context, the appellant "carries the heavy burden of demonstrating that the verdict was clearly, decidedly, or overwhelmingly against the weight of the evidence." Campbell v. Bartlett, 975 F.2d 1569, 1577 (10th Cir. 1992). Further, "absent an award so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the facts is considered inviolate." Id.

We conclude that Emerson's arguments in support of its request for remittitur are, as noted by the district court, simply a restatement of the arguments it made in support of

its motion for judgment as a matter of law and/or new trial. Having rejected those arguments, we also conclude there was no basis for granting remittitur.

*Amendment of pretrial order*

In discussing the district court's ruling on its motion for remittitur, Emerson contends that Bennett's damages should have been limited to the amounts listed in the pretrial order entered on June 7, 2001, totaling $137,185.00. In support of this contention, Emerson complains the district court permitted Bennett to amend the pretrial order the day before trial to seek lost wages and benefits totaling $679,667.00. In other words, Emerson is effectively asserting that the court erred in allowing this amendment to the pretrial order.

We review for abuse of discretion a district court's ruling on a motion to amend a pretrial order. Koch v. Koch Indus., Inc., 203 F.3d 1202, 1222 (10th Cir. 2000). "A pretrial order, which measures the dimensions of the lawsuit, both in the trial court and on appeal, may be modified 'only to prevent manifest injustice.'" Davey v. Lockheed Martin Corp., 301 F.3d 1204, 1208 (10th Cir. 2002) (quoting Fed. R. Civ. P. 16(e)). "The party moving to amend the order bears the burden to prove the manifest injustice that would otherwise occur." Id. "Because the issues and defenses of the lawsuit are defined by the terms of the order, total inflexibility is undesirable." Id.

Throughout the proceedings in the district court, Bennett alleged two alternative

18

damage scenarios: one that included damages arising from his July 2000 injury (while working for ShopSmith), and one that did not.  As a result of an apparent oversight on the part of Bennett's counsel, the pretrial order included only the latter damage figure (i.e., it did not include damages related to the July 2000 injury).  Bennett sought to amend the pretrial order to increase the total amount of alleged damages from $137,185.00 (the amount associated with the lower damage scenario) to $679,667.00 (the amount associated with the higher damage scenario).  In doing so, Bennett argued that the higher damage figure was alleged in his expert's report and addressed in the expert's deposition.

The district court granted Bennett's motion to amend the pretrial order, stating:

> I started my analysis by looking at the report of the plaintiff's expert that was dated February 13, 2001, and I found in there that, in fact, the plaintiff's expert did make two separate calculations, one which arrived at the $137,000-plus figure, which was premised on a netting out, taking into account the earnings that hypothetically could have been earned at the alternative employment, and the $679,667 recovery, which was a figure that didn't offset any wages that might have been earned from alternative employment based upon the fact of the accident that occurred.
> So the defendant certainly was on notice as of the receipt of the defendant's expert report that the plaintiff's claim for damages depended upon two separate alternative theories there as to what it might happen to be.
> At the time of the deposition counsel for the defendant asked questions about Exhibit 5 of the report, at page 27, for example, of the deposition, and it was explained to him by the expert exactly what [was] the function of that particular report.  So, again, I think defendant was on notice.  It appears to me that the final pretrial order in this case was, pure and simple, a mistake in limiting the damage claim to $137,000, and I also further conclude that there is no unfair prejudice to the defendant.  The concerns that I expressed this morning about ability to cure any unfair prejudice have been alleviated in my mind by finding that going back to last February this information about the $679,000-plus recovery was part of the

19

discovery that had been exchanged in this case. So I think there was plenty of opportunity for the defendant to deal with that, to depose intelligently about it, to come up with other evidence that the defendant might have wanted to rebut it; and I think the fact that the defendant has continued to process the potential of other witnesses and/or documents to deal with whether or not the plaintiff remains disabled and so forth is indicative of the fact that the defendant did, in fact, recognize to a certain extent at least what the lay of the land was.

So I am going to permit amendment of the final pretrial order to prevent manifest injustice here, and the claim involving the $679,667 recovery will be inserted in the pretrial order in that respect.

App. at 253-55. We conclude the district court did not abuse its discretion in allowing the amendment. As the court noted, Emerson was well aware of the $679,667.00 damage figure, and amendment of the pretrial order to include that figure was necessary to prevent manifest injustice to Bennett.

AFFIRMED.

Entered by the Court

Mary Beck Briscoe
Circuit Judge

20